## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:22-mc-20422-JEM

UNITED STATES OF AMERICA,

      Petitioner,

v.

SUZETTE BONANNO; CHARLES
BONANNO; and SIMFA ROSE
PHARMACEUTICAL SPECIALTY, INC.
d/b/a SIMFAROSE PHARMACY.

      Respondents.

_____/

### REPLY IN SUPPORT OF UNITED STATES' PETITION FOR SUMMARY ENFORCEMENT OF CIVIL INVESTIGATIVE DEMAND 2021-SP-DMR/INT-01

      The United States (the "Government"), by and through the undersigned counsel, hereby files its reply in support of its petition to enforce Civil Investigative Demand 2021-SP-DMR/INT-01 ("CID 2021-SP-DMR/INT-01" or "the CID").[1]

## INTRODUCTION

      As already stated in the United States' petition to enforce the CID, Respondents failed to timely challenge the CID within the twenty-day period required under 31 U.S.C. § 3733(j)(2)(A)(i) and have therefore waived any objections. Nevertheless, the Government addresses the arguments in Respondents' Memorandum of Law in Opposition of the United States' Petition for Summary Enforcement ("Respondents' Opposition") [ECF No. 14], none of which are well-founded. Respondents attempt to invalidate the CID by arguing that the Government already made an election in a completely separate matter previously filed in the District of New Jersey. Even if the

---

[1] An unredacted version of this Reply is being filed under seal pursuant to this Court's Order [ECF No. 21], though some limited redactions will remain in the sealed filing to protect private information of third parties and patients.

CID statute could reasonably be read to preclude further CIDs in separate matters, which it cannot, CID 2021-SP-DMR/INT-01 had already been served on Respondents when the United States made its election to decline intervention as to the conduct involving SimfaRose Pharmacy and Charles Bonanno. Respondents also argue without any legitimate basis that the United States' investigation is unlawful or improper, distorting several facts to portray the investigation in a negative light. They also attempt to avoid CID compliance by claiming that the United States already obtained the documents it seeks through a DEA administrative inspection warrant – a completely separate process, under a separate authority and agency, focusing on a different scope of documents. These arguments are unavailing. For the reasons stated herein, Respondents should be required to comply with the CID.

## STATEMENT OF ADDITIONAL MATERIAL FACTS

### A. The New Jersey Matter

1.      On September 19, 2014, a Relator filed a complaint in the District of New Jersey under the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3729-3733 *et seq*., naming as defendants ProStrakan, Inc., Galena Biopharma, Inc. ("Galena"), Charles Bonanno, and SimfaRose Pharmacy, among other defendants (hereinafter "the ProStrakan Action"). *U.S. ex rel. Jane Doe v. Prostrakan, Inc.*, No. 14-cv-05865 ("Exhibit A"). The matter has been unsealed.

2.      The ProStrakan Action alleged generally that the defendants engaged in an off-label prescription drug marketing and unlawful kickback scheme with respect to the drugs Sancuso and Abstral. Specifically with respect to SimfaRose Pharmacy, located in Pembroke Pines, Florida, the complaint alleged that the pharmacy had a relationship with Sancuso[2] manufacturer ProStrakan, and that the defendants worked together to induce physicians to improperly prescribe Sancuso off-label to non-cancer patients. The complaint further alleged that SimfaRose improperly dispensed

_____

[2] Sancuso is prescribed to chemotherapy patients to treat nausea and vomiting symptoms.

as much Sancuso as possible, including without proper prescriptions.

3.     On September 8, 2017, the United States filed a notice of partial intervention in the ProStrakan Action [No. 14-cv-05865, ECF No. 15] for purposes of settlement only and only with respect to defendant Galena. The notice of partial intervention stated that the United States was intervening only with respect to the "covered conduct" specifically outlined in the notice:

> The United States contends that it has certain civil claims against Galena under the False Claims Act [and other laws] . . . arising from Galena's practice of paying kickbacks to physicians in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), during the period from June 1, 2013, through November 20, 2015, in order to induce them to prescribe Abstral . . . .

4.     The notice of partial intervention for purposes of settlement also stated: "Although the United States' investigation regarding Galena will be resolved, the United States' investigation regarding several of the other defendants in this case remains ongoing." SimfaRose and Charles Bonanno were among the defendants who continued to be investigated. *Id.*

5.     On July 12, 2021, several months after Respondents had been served with CID 2021-SP-DMR/INT-01 on March 26, 2021, the United States filed a notice of election to decline intervention in the ProStrakan action [No. 14-cv-05865, ECF No. 18].

6.     The District of New Jersey issued subpoenas to Respondent SimfaRose under the Health Insurance Portability and Accountability Act of 1996, Public Law No. 104-91, 18 U.S.C. § 3486 ("HIPAA subpoenas"). One subpoena was issued June 23, 2016; another on March 15, 2017; and another on September 7, 2017. The HIPAA subpoenas are attached as Exhibit B.

7.     To the Government's knowledge, Respondents did not certify that they fully complied with the HIPAA subpoenas.[3]

**B.  The Conflict of Interest Notice**

---

[3] Respondents produced boxes of paper documents in response to the New Jersey HIPAA subpoenas, as they did in response to CID 2021-SP-DMR/INT-01. The Government has not located any certifications.

8.      On March 26, 2021, the same day Respondents were served with CID 2021-SP-DMR/INT-01, the United States sent an email to SimfaRose counsel Andrea Wolfson notifying her that a potential conflict of interest had been identified █████████████████████████████

███████████████████████████████████████████████████████████████████████████████

Ms. Wolfson was asked to discuss the issue further since she might be a witness in the matter. Second Declaration of Clarissa Pinheiro Schild ("Second Decl."), ¶ 4, Ex. C. The email was sent only to Ms. Wolfson.

9.      On April 5, 2021, the United States also sent an email to Respondents' counsel, Andrea Wolfson and John Tartaglia, with an attached letter citing the applicable Florida Rules of Professional Conduct, explaining that a potential conflict of interest had been identified between Ms. Wolfson and her client ████████████████████████████████████████████

███████████████████████████████████████ and stating:

> We request that you respond to this letter in writing by Monday, April 12, 2021, providing sufficient evidence or information for the government to assess █████
> ████████████████████████████████████████████████████████
> ████████████████████████████████████████████████

Second Decl., ¶ 6, Ex. D.

10.     ████████████████████████ Attorney John Tartaglia was included in the April 5, 2021, email communication only after consultation with Ms. Wolfson and Mr. Tartaglia. Second Decl., ¶ 5, Ex. E.

11.     Between April 5, 2021, and June 29, 2021, counsel for Respondents provided the United States their chosen information to address ████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████ Second Decl. ¶ 10.

12.     On June 29, 2021, at the Government's request, Respondents provided their consent in writing to continued representation by Ms. Wolfson. Second Decl. ¶ 11, Ex. F.

4

13.     Following receipt of Respondents' consent to continued representation, the Government requested no further information from Respondents or Ms. Wolfson to address the potential conflict of interest between them. Second Decl. ¶ 12.

14.     In its petition for summary enforcement of the CID, the United States ████ ████████████████████████████████████████████████████ The issue was originally raised by Respondents in their Opposition.

**C. DEA's Administrative Inspection Warrant**

15.     On December 17, 2021, the Drug Enforcement Administration ("DEA") executed an Administrative Inspection Warrant ("AIW") at SimfaRose Pharmacy, located at 10016 Pines Blvd, Pembroke Pines, FL 33024.

16.     The AIW was signed and approved by U.S. Magistrate Judge Jacqueline Becerra in this district on December 13, 2021, under case number 1:21-mj-04341 and executed pursuant to DEA's administrative inspection authority granted under 21 U.S.C. § 880.

17.     The AIW gave DEA authority to seize cell phones containing relevant records and information. However, as indicated on the receipt or inventory of items taken, no cell phones were among the items. *See* Declaration of Melissa Szwanke ("Szwanke Decl."), ¶ 7, Ex. 1.

18.     DEA also seized one pharmacy server, two external hard drives, fourteen miscellaneous flash drives, one DVR, and one desktop computer, as stated in the DEA inventory of items seized. *Id.*

19.     Other computers and a back-up server were left with the pharmacy after Charles Bonanno confirmed that the back-up server contained duplicates of all items on the seized server. *Id.* at ¶ 8.

20.     At no time was Charles Bonanno prevented from seeking medical care. *Id.* at ¶ 6.

21.     At no time was Charles Bonanno forbidden from consulting his attorney. *Id.* at ¶ 5.

22.     At no time was Charles Bonanno handcuffed during the AIW. *Id.* at ¶ 4.

23.     A receipt with written inventory of property taken was left with Charles Bonanno at SimfaRose Pharmacy upon completion of the AIW on December 17, 2021. *Id.* at ¶ 7. [4]

24.     Counsel for the United States sent an email to Respondents' counsel on January 7, 2022, explaining what items had been taken during the AIW, what items had not been taken, and what items the United States still expected should be produced in response to the CID. Respondents' counsel did not respond. Second Decl., ¶ 15, Ex. G.

25.     In executing the AIW, DEA focused on records from SimfaRose Pharmacy for a two-year period, not the longer timeframe covered by the CID. Szwanke Decl. ¶ 9.

## <u>MEMORANDUM OF LAW</u>

Respondents failed to petition to modify or set aside the CID within the twenty-day deadline in 31 U.S.C. § 3733(j)(2)(A)(i) and have therefore waived any objection to the CID. They are now more than one year late in complying with a federal administrative subpoena. Nevertheless, they now attempt to avoid the CID by making technical arguments not supported by law and raising serious yet baseless allegations about Government wrongdoing, arguing in part they have been involved in investigations too long. If these arguments permitted avoiding a CID, CID recipients could successfully thwart legitimate federal investigations by withholding relevant documents and impeding the Government's efforts for years, only to say later that the investigations took too long, were abusive, and should be cut off. It is important not to set such a precedent. Respondents continue to feign cooperation with the Government when, time after time, they ignore the Government's follow-up requests for specific outstanding items. Since the filing of the petition for enforcement, Respondents have not made any substantive productions to the Government. They are aware that they have not produced basic information such as a complete

---

[4] Respondents question whether DEA ever filed a return of the AIW in accordance with 21 U.S.C. § 880(d)(3). Respts.' Opposition at 11, footnote 4. A return was filed under case number 1:21-mj-04341, together with the written inventory of property taken.

list of wholesalers and corresponding contact information. Petitioner respectfully requests that the Court order Respondents to comply.

### A. THE DISTRICT OF NEW JERSEY MATTER DOES NOT PRECLUDE OTHER INVESTIGATIONS.

#### 1. The New Jersey *qui tam* and Southern District of Florida investigations are separate false claims law investigations.

Respondents argue that, because the Government made an "election" in *U.S. ex rel. Jane Doe v. Prostrakan, Inc.*, No. 14-cv-05865, the Southern District of Florida ("SDFL") lacked authority to issue the CID to Respondents. Respondents take the position that once the Government makes any election in a False Claims Act ("FCA") *qui tam* matter that names certain defendants, the Government forever loses its ability to issue CIDs in separate investigations involving those defendants. Respondents make several inaccurate assumptions, including that the New Jersey *qui tam* and the SDFL's investigation involve the same issues and scope (they do not). Nothing in 31 U.S.C. § 3733(a)(1) limits the United States' authority to issue CIDs in the sweeping manner that Respondents claim.

The United States' CID authority under 31 U.S.C. § 3733(a)(1) provides:

> Whenever the Attorney General, or a designee (for purposes of this section), has reason to believe that any person may be in possession, custody, or control of any documentary material or information relevant to a false claims law investigation, the Attorney General, or a designee, may, before commencing a civil proceeding under section 3730(a) or other false claims law, or making an election under section 3730(b), issue in writing and cause to be served upon such person, a civil investigative demand . . . .

31 U.S.C. § 3733(a)(1). The statute defines a "false claims law investigation" as "any inquiry conducted by a false claims law investigator for the purpose of ascertaining whether any person is or has been engaged in any violation of a false claims law." 31 U.S.C. § 3733(1)(2).

The plain language of the statute refers to "a false claims law investigation." In any false claims law investigation, CIDs may be issued until the Government commences litigation or makes an election. The false claims law investigation in the ProStrakan Action was completely separate

from the false claims law investigation in the SDFL that led to the issuance of CID 2021-SP-DMR/INT-01. Each district handles its own investigations, and if a district is aware of information indicating possible FCA violations, an investigation may be opened. If litigation arises out of one investigation, it does not preclude pursuing other investigations in other districts.

Respondents offer no support (and there is none) for their argument that an entity cannot be investigated simultaneously in separate investigations looking at different conduct. In fact, it is fairly common in the health care context for large hospital chains or pharmaceutical companies, for example, to respond to more than one investigation simultaneously, including responding to CIDs. Most cases cited by Respondents relate to completely different provisions such as the "government action bar," which states: "In no event may a person bring an action under [the FCA] which is based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party." 31 U.S.C. § 3730(e)(3). Section 3730(e)(3) was intended to prevent relators from filing "parasitic lawsuits which enriched the relator without exposing fraud the Government was not already aware of." *U.S. ex rel. Estate of Gadbois v. PharMerica Corp.*, 292 F.Supp.3d 570, 580 (D.R.I. 2017). The case law analyzing section 3730(e)(3), for instance, is completely inapplicable here, as the wording of that provision and its intent are entirely different from the provision at issue, section 3733(a)(1). The cases cited do not relate to the correct provision.

### 2. The scope of each investigation is different.

Respondents argue that the ProStrakan Action involved the same issues as the SDFL investigation, but that is not the case. The investigations are not only separate in that they were handled by different districts, but they also cover different timeframes and different conduct. Respondents conveniently gloss over the details of the ProStrakan Action, which make clear that an election made in that matter should have no bearing on the SDFL's investigation. On September 19, 2014, a Relator filed the ProStrakan Action in the District of New Jersey, naming as defendants ProStrakan, Inc., Galena Biopharma, Inc. ("Galena"), Charles Bonanno, and SimfaRose

Pharmacy, among other defendants. The complaint alleged that the defendants participated in an off-label prescription drug marketing and unlawful kickback scheme with respect to the drugs Sancuso and Abstral. Since the ProStrakan complaint was filed in 2014, the allegations obviously focused on conduct that occurred prior to that date, whereas the relevant time frame of CID 2021-SP-DMR/INT-01 does not begin until January 2015.

A review of the ProStrakan complaint and the HIPAA subpoenas issued to SimfaRose Pharmacy by the District of New Jersey on June 23, 2016; March 15, 2017; and September 7, 2017; indicates that the conduct being investigated was a very specific alleged scheme related to Sancuso and Abstral, that the relevant timeframe was different, and that the inquiry involved SimfaRose's relationships with the other specific defendants named in the *qui tam* action. By comparison, a review of CID 2021-SP-DMR/INT-01 shows that the investigation covers broader issues and focuses specifically on SimfaRose and its related branches. The SDFL investigation is not limited to two medications like the ProStrakan Action, and  instead relates to SimfaRose's dispensing practices generally. The SDFL is investigating, for example, whether Respondents billed Medicare or other federal programs for medications they did not dispense or more medications than they actually purchased; whether Respondents billed federal programs for prescriptions that were not medically necessary; and whether Respondents dispensed improper prescriptions, including high-dose opioids and cocktails. CID 2021-SP-DMR/INT-01 is therefore not duplicative of prior subpoenas. Respondents' position that the ProStrakan Action forecloses the possibility of further CIDs would only make sense if, at the very least, the conduct and timeframe being investigated were the same, but they are not.

### 3. The election in the ProStrakan Action occurred after CID 2021-SP-DMR/INT-01 was issued to Respondents, and the 2017 partial election would not preclude this CID.

Even if 31 U.S.C. § 3733(a)(1) could reasonably be read to preclude a separate or future false claims law investigation after making an election in a *qui tam*, which it cannot, the United States made its election to decline intervention in the ProStrakan Action on July 12, 2021, several

months *after* Respondents were served with CID 2021-SP-DMR/INT-01 on March 26, 2021. Had Respondents timely complied with the CID, the Government would have received the requested documents and information before making an election in the ProStrakan Action. Respondents' refusal to comply timely should not be permitted as a tactic to avoid the CID. They were required to comply then and should be compelled to comply now.

Respondents argue that the United States' partial intervention in the ProStrakan Action for settlement purposes on September 8, 2017, is the relevant "election" that precludes further CIDs. But this interpretation of 31 U.S.C. § 3733(a)(1) makes no sense for several reasons. As discussed above, section 3733(a)(1) is plainly written to address when CIDs may be issued in a specific false claims act investigation, not in other investigations. Thus, the partial intervention from September 2017 is irrelevant to the SDFL investigation. The legislative history of section 3733(a)(1) is also instructive. The prior version of the statute, as revised by amendments to the FCA added in 1986, was discussed in *Avco Corp. v. U.S. Dep't of Justice*, 884 F.2d 621, 622-23 (D.C. Cir. 1989), and made no reference to "making an election." At the time, section 3733(a)(1) stated:

> Whenever the Attorney General has reason to believe that any person may be in possession, custody, or control of any documentary material or information relevant to a false claims law investigation, the Attorney General may, *before commencing a civil proceeding under section 3730 or other false claims law*, issue in writing and cause to be served upon such a person, a civil investigative demand . . . .

31 U.S.C. § 3733(a)(1) (1986) (emphasis added).

The logical reading of section 3733(a)(1) as then written was to allow for CIDs up until the Government filed an FCA complaint, or commenced litigation, at which point the proper means of obtaining information from the defendants in that matter would be through the ordinary discovery process. *See Avco*, 884 F.2d at 624 (recognizing that it would be "an unusual result" if the Attorney General could intervene in *qui tam* litigation but "continue to use the CID as an extraordinary and *ex parte* means of obtaining discovery"). While it makes sense to cut off CID authority once litigation commences, it would be pointless to cut off the Government's ability to

10

issue CIDs in other investigations – the ordinary discovery process in the intervened litigation matter would be unhelpful and unrelated to the other investigations, and it is unlikely Congress meant to prevent the Government from pursuing other worthy cases.

In 2009, when section 3733(a)(1) was again amended, Congress added the language clarifying that a CID could be issued "before commencing a civil proceeding under section 3730(a) or other false claims law, *or making an election under section 3730(b)*." 155 Cong. Rec. H5260-01 (2009) (emphasis added). The legislative history of the 2009 amendments does not thoroughly explain the precise intent behind the language chosen for section 3733(a)(1). However, time and time again the remarks of members of Congress emphasized that the goal of the 2009 amendments was to expand the Government's ability to recover funds lost to fraud, and to strengthen the FCA. Congressman Howard Berman of California remarked that "as a result of restrictive language in the False Claims Act's CID provisions, the Department of Justice very rarely uses CIDs." 155 Cong. Rec. E1295-03, E1299 (2009). He stated: "[u]se of this tool, provided for in Section 3733, is increasingly necessary for effective investigation of False Claims Act allegations. Program agencies are strapped for resources and unable to assign investigators even to meritorious cases . . . ." *Id.* Speaking generally about the FCA amendments, the Congressman explained:

> The False Claims Act amendments . . . remove some of the confusion that is currently undermining the Act's ability to fully reach those who target the American tax dollar. S. 386 clarifies a number of key provisions and reaffirms that the False Claims Act is intended to protect all Government funds, without qualification or limitation, from the predation of those who would avail themselves of taxpayer money without the right to do so. This legislation is the first step in correcting the erosion of the effectiveness of the False Claims Act that has resulted from court decisions contrary to the intent of Congress.

*Id.* at E1297.[5] It would therefore be inconsistent with the stated Congressional intent to interpret

---

[5] Congressman Jim Sensenbrenner from Wisconsin stated: "Several Federal courts have applied and interpreted provisions of the FCA in ways that have substantially weakened the law. This bill changes that . . . It is my hope . . . fraudsters will no longer be able to hide behind judicially created

the amendments to section 3733(a)(1), i.e., the references to "making an election," to significantly limit the Attorney General's CID authority.

The United States' September 8, 2017, notice of partial intervention in the ProStrakan Action simply informed the Court that the Government was settling a limited subset of claims with respect to defendant Galena. The Government thoroughly explained in its notice that the partial intervention was only with respect to specific "covered conduct" by defendant Galena, "arising from Galena's practice of paying kickbacks to physicians in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), during the period from June 1, 2013, through November 20, 2015, in order to induce them to prescribe Abstral." It is clear from the United States' September 8, 2017, notice that its election to partially intervene at this stage pertained to very specific conduct and issues, and did not pertain to conduct by Respondents or the conduct being investigated by the SDFL. It should not serve to cut off the Government from pursuing unrelated claims.

Respondents' interpretation of the statute would allow for absurd outcomes. For example, a *qui tam* relator might erroneously name a defendant in a lawsuit, and the claims brought by the relator against that defendant might prove unfounded. The Government would conduct an investigation and make an election to decline intervention in that lawsuit. But the Government might later discover new and accurate information pertaining to that defendant and might have reason to open a new investigation into alleged misconduct under the FCA. Under Respondents' interpretation, the Government would be barred from opening an investigation into the new leads, even if the issues or scope were different from the original *qui tam* action, simply because the Government made an election to decline intervention. A private citizen relator could, by virtue of making a mistake and including the wrong defendant in a lawsuit, protect that defendant from

---

qualifications and evade liability. Especially in these challenging times, there is no patience for individuals making false claims and benefiting from them." 155 Cong. Rec. H5260-01, at *H5265 (2009).

future investigations. This cannot be what Congress intended, as it would prevent the United States from pursuing legitimate FCA inquiries and recovering monies fraudulently taken from the Government and taxpayers. *See Avco*, 884 F.2d at 626-27 (D.C. Cir. 1989) (finding that appellant's proposed interpretation of the CID statute was illogical because it would mean *qui tam* relators, who are private citizens and "can be anyone," "could innocently or collusively deprive the Attorney General of a weapon Congress had been at pains to give him" simply by filing suit and thereby depriving the Government of the ability to issue further CIDs).

The Government may decline to intervene in a *qui tam* action for various reasons not shared with defendants, including potentially a lack of resources to bring a particular investigation to a conclusion.[6] Defendants in *qui tam* matters may, and often do, attempt to "run out the clock," delaying compliance with an investigation as long as possible, forcing the Government to run out of time and decline intervention, only to argue later that the Government has now lost its opportunity to issue further CIDs. Respondents' interpretation of section 3733(a)(1) would undoubtedly encourage this type of behavior by defendants in FCA matters. Delay compliance, delay the investigation, force an election to decline intervention, and then argue that the Government is now precluded from any further investigation, including a separate one. Defendants in FCA actions should not be permitted to use this strategy to avoid valid investigations and valid CIDs. This could not have been Congress's intention when drafting the statute, which was designed to expand the Government's ability to recover its losses through the grant of CID authority.

Respondents do cite a relevant case in their Opposition, *U.S. ex rel. Silva v. VICI Marketing, LLC,* No. 8:15-cv-444-T-33TGW, 2020 WL 1677335, at *1-2 (M.D. Fla. April 6,

---

[6] Respondents point out that the United States declined to intervene in the ProStrakan Action, implying this meant they were absolved from any wrongdoing. But a decision to decline intervention does not mean there was a finding of no wrongdoing.

2020), but the *Silva* decision actually supports the Government's interpretation of section 3733(a)(1), not the Respondents'. In *Silva*, the United States issued CIDs to third parties to determine whether to bring separate FCA actions against the third parties, even though a related FCA case was already pending against other defendants. The United States took the position that the statute did not prevent issuing additional CIDs to third parties because CIDs may be issued to a person until the United States makes an election or commences litigation with respect to *that person* in that matter. *See id.* at *1-2. The Middle District of Florida agreed with the Government's interpretation and refused to set aside the Government's CIDs to the third parties. *Id.* The Middle District's decision was appealed. *USA v. Belcher Pharmaceuticals, LLC*, No. 20-11498 (11th Cir. filed April 21, 2020). Although the case was resolved before the Eleventh Circuit issued a decision on the appeal, the Court implied, approximately three minutes and fifty seconds into the oral argument, that if a decision had been reached on the merits, it would have found in favor of the Government.[7] Under the rationale applied in *Silva*, the United States' September 8, 2017, notice of partial intervention, which related only to defendant Galena, would not preclude issuing further CIDs to Charles Bonanno or SimfaRose Pharmacy in a separate matter.

### 4. Respondents offer no other valid bases to quash the CID.

Nor should CID 2021-SP-DMR/INT-01 be quashed simply because Respondents were involved in a prior *qui tam* that took years to conclude. Investigations often take substantial time to resolve due to defendants' failure to cooperate. The Government has a duty to thoroughly investigate fraud allegations that are brought forward, and if subsequent information comes to light, another investigation may arise. Respondents also challenge the legitimacy of the SDFL's investigation in part by claiming it rests on shaky ground, including allegations brought by a former

---

[7] A recording of the oral argument is available on the website of the United States Court of Appeals for the Eleventh Circuit, available at https://www.ca11.uscourts.gov/oral-argument-recordings.

SimfaRose employee whom Respondents claim lacks credibility. But Respondents do not actually know all the information the Government has and is relying on at this stage, as the Government avoids revealing such details to preserve the integrity of its investigations and avoid tipping off witnesses. Respondents simply speculate that they know the basis for the Government's inquiry. The Government should not be obligated to reveal further its sources of information at this stage, and Respondents should not be able to quash a CID merely by speculating about the Government's information and motives without actual evidence of impropriety.

At any rate, none of these arguments amounts to an improper purpose or bad faith. Under *United States v. Powell*, 379 U.S. 48, 58 (1964), *United States v. Markwood*, 48 F.3d 969, 984-86 (6th Cir. 1995), and related cases, a CID must generally be enforced if the agency has authority to issue it and it is reasonably relevant to the investigation, unless it is issued for an improper purpose or in bad faith. Although Respondents may not wish to be involved in investigations, they provide no facts that show the Attorney General's designee, the U.S. Attorney, issued the CID for any purpose but to investigate and evaluate whether the FCA has been violated.

### B. RESPONDENTS DISTORTED THE GOVERNMENT'S CONFLICT OF INTEREST NOTICE TO SUGGEST SOME IMPROPER MOTIVE OR BAD FAITH FOR THE GOVERNMENT'S INVESTIGATION.

Early in the SDFL's investigation of Respondents, the Government learned



When the Government served CID 2021-SP-DMR/INT-01 on Respondents, it immediately emailed Ms. Wolfson, already known to represent SimfaRose, notifying her that a potential conflict of interest had been identified

Second Decl., ¶ 4, Ex. C. The email was sent only to Ms. Wolfson. Following the email and service of the CID, Ms. Wolfson and another attorney, Mr. John Tartaglia, communicated with the Government about the CID and the potential conflict of interest. The Government informed Ms. Wolfson and Mr. Tartaglia that it would follow up with a letter including additional information about the potential conflict, and asked Ms. Wolfson if Mr. Tartaglia could be included in the communication ██████████████████████████████████████████ Second Decl., ¶ 5, Ex. E. Ms. Wolfson agreed in writing that Mr. Tartaglia could be included in the communication. *Id.* The conflict of interest letter ████████████████████████████████████████████████████████ was shared only with Ms. Wolfson, Mr. Tartaglia, and Government personnel working on the matter. Additionally, while Respondents accuse the United States of "publishing" derogatory information about Ms. Wolfson (Respts.' Opposition at 3), it was Respondents who first ████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████

The conflict of interest letter requested additional information from Ms. Wolfson in order to fulfill the Government's obligations to address the potential conflict. It was up to Ms. Wolfson what additional information she believed she needed to provide to resolve the conflict. ████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████ and the Government acted with professionalism in alerting her to the potential conflict. Once Ms. Wolfson provided information about the conflict, and once her client agreed in writing to proceed with the representation nonetheless, the Government proceeded with its investigation and continued to deal professionally with Ms. Wolfson as counsel. Respondents now distort the facts in an effort to avoid

16

their obligations under the CID. CID recipients have few means under the law to avoid complying with a valid CID, such as showing an improper purpose that would abuse the court's process, or bad faith. *See Powell*, 379 U.S. at 58; *Markwood*, 48 F.3d at 978 (citing *United States v. LaSalle Nat'l Bank,* 437 U.S. 298 (1978)). Respondents' completely false accusations about a "nefarious scheme" and the Government's alleged handling of Ms. Wolfson's situation is a clear attempt at establishing bad faith to avoid CID compliance and nothing more.

But the challenger of a CID bears a "heavy burden" of demonstrating such impropriety. *Markwood*, 48 F.3d at 978 (citation omitted). Respondents' and their counsel's distorted facts, as described in their inaccurate declarations,[8] are unsupported by the record and insufficient to make the requisite showing.

### C. THE DEA'S EXECUTION OF AN ADMINISTRATIVE INSPECTION WARRANT DOES NOT EXCUSE RESPONDENTS FROM COMPLYING WITH THE CID.

Respondents' allegations with regard to the DEA administrative inspection warrant ("AIW") are another failed attempt at demonstrating impropriety or bad faith to avoid compliance with the CID. DEA has its own authority to conduct investigations involving possible violations of the Controlled Substances Act ("CSA"), 21 U.S.C. §§ 801-904. To ensure compliance with the

---

[8] The declarations attached to Respondents' Opposition are filled with inaccuracies and vague references. For example, the Declaration of Andrea Wolfson [ECF No. 14-1] references a prior "CID" served on her clients. Ms. Wolfson is apparently referring to DEA Administrative Subpoena No. G1-20-888152, not a CID, served on SimfaRose in September 2020 in a separate investigation of a Florida physician investigated for dangerous prescribing of controlled substances. SimfaRose was involved because it dispensed some medications prescribed by the physician. Ms. Wolfson's declaration is alarmingly inaccurate in its description of the events regarding the DEA subpoena, including her reference to objecting based on attorney-client privilege. Wolfson Decl. ¶¶ 11-13. A copy of Ms. Wolfson's response to the DEA subpoena is attached. Second Decl. ¶ 13, Ex. J. The response contains no reference to attorney-client privilege. The Government notes that SimfaRose never fully complied with that DEA Subpoena despite multiple efforts by the Government to follow up. *See* Second Decl. ¶ 14, Ex. K.

CSA and its implementing regulations, DEA is authorized to conduct inspection of the premises of registrants, i.e., those who register with DEA to dispense controlled substances. 21 U.S.C. §§ 878(a)(2) and 880. SimfaRose Pharmacy is a registrant with DEA.

Pursuant to 21 U.S.C. § 880(b)(3), the DEA is authorized to conduct an administrative inspection to: (1) inspect and copy records, information, reports, and other documents required to be kept or made under the Act; and (2) inspect the controlled premises, all pertinent equipment, drugs, and other substances or materials, containers, and labeling found therein (including records, files, papers, processes, controls and facilities) appropriate for verification of the records, information, reports and documents, or otherwise bearing on the provisions of the Act; and (3) inventory the stock of any controlled substance or listed chemical and obtain samples of such substances. 21 U.S.C. § 880(b)(3). The DEA is authorized to apply for an AIW *ex parte*.

On December 13, 2021, the DEA obtained, in accordance with appropriate procedures under 21 U.S.C. § 880, an AIW signed and approved by U.S. Magistrate Judge Jacqueline Becerra in this district under case number 1:21-mj-04341. The AIW was executed on December 17, 2021. During the AIW, Mr. Charles Bonanno was not handcuffed, forbidden from consulting with counsel, or prevented from seeking medical care. Szwanke Decl. ¶¶ 4-6. Should Respondents wish to make a complaint about the handling of the AIW, the appropriate avenue is to file a complaint with the DEA Office of Professional Responsibility ("OPR"). A copy of Respondents' Opposition and declarations have already been shared by the Government with DEA OPR. The allegations about the handling of the AIW are completely separate and unrelated to Respondents' obligations under the CID. *See also*, Second Decl. ¶ 3.

Respondents claim that through the AIW, the Government "is now in possession of all documents they seek and respondents have no means to re-create the documents unlawfully confiscated." Respts.' Opposition at 4. This argument is at the very least disingenuous based on prior communications between the Government and Respondents, through counsel, during CID negotiations. The Government has consistently informed Respondents that they must still comply

with the CID despite the execution of the AIW because the AIW and CID are separate processes, and DEA did not obtain all relevant records responsive to the CID through the AIW. At the same time, Respondents have also been consistently told, through counsel, that they are not expected to produce documents that they do not have in their possession if the only copy was seized. Ex. G.

On January 7, 2022, counsel for the United States sent an email to Respondents' counsel explaining what items had been taken during the AIW, what items had not been taken, and what items the United States still expected should be produced in response to the CID. Second Decl. ¶ 15, Ex. G. This email was not the only communication between the parties on this issue. Yet Respondents never addressed the Government's email, continue to ignore the information shared in the email, and continue to wrongly claim that items were taken that were not. The Government has already reminded Respondents that cell phones or their data were not taken (even though DEA had authority to take cell phones), yet Respondents' Opposition alleges "unlawful seizure" of cell phones. Respts.' Opposition at 4; Szwanke Decl., Ex. 1; Second Decl. ¶ 15, Ex. G. DEA seized one desktop computer, one server, and several drives, but other computers, including Charles Bonanno's laptop, were not seized, and Respondents were left with a back-up server that, according to Charles Bonanno, contained duplicates of the information on the seized server. Szwanke Decl. ¶¶ 7-8, Ex. 1; Second Decl. ¶ 15, Ex. G. Respondents still have an abundance of documentation in their possession, yet have represented to this Court that they do not. Importantly, to give some examples, Respondents should still produce relevant emails and text messages yet have failed to do so. They should also produce wholesaler invoices and contact information. Any of these items that are responsive to the CID should be produced and any privilege log provided.

As Respondents are already aware, records were not seized during the AIW if they were clearly unrelated to controlled substances, and many records seized covered only a two-year period. *See* Szwanke Decl. ¶ 9. Yet some of those records not related to controlled substances would still be responsive to the CID and highly relevant to the FCA investigation, as explained in the Government's January 7, 2022 email. Ex. G. Still, Respondents continue to claim that virtually

everything has been taken and they are "incapable of any further compliance with the CID." Respts.' Opposition at 4. This is simply not true.

Respondents also claim to have been cooperative and made best efforts, but this is not true. As outlined in the petition to enforce, substantial documents remain outstanding. Government requests for follow-up have been ignored or met with efforts to create distractions. No new substantive document production has occurred since the filing of the petition.

The Government is concerned about Respondents' representations before this Court. However, it would be a poor use of Government resources or this Court's time to go through every inaccuracy in their Opposition, particularly since they are not relevant to CID enforcement. The exhibits to the Government's declarations show the many attempts made over the past year to clarify repeated inaccuracies in Respondents' counsel's communications (e.g. Second Decl. ¶¶ 8-9, Ex. H, I), and multiple attempts at conferring with and accommodating Respondents. Respondents on the other hand have continued in their efforts to muddy the record as much as possible to hinder the Government's investigations. The United States respectfully requests that Respondents be ordered to fulfill their obligations despite their repeated efforts to evade them.

## CONCLUSION

For the above reasons, the United States respectfully requests that the Court grant its petition and order Respondents to comply with CID 2021-SP-DMR/INT-01 on or before the deadlines proposed by the United States or such other deadlines set by the Court.

Dated: May 11, 2022                         Respectfully submitted,

                                            **JUAN ANTONIO GONZALEZ**
                                            **United States Attorney**

                                            *Clarissa Pinheiro Schild*
                                            **Clarissa Pinheiro Schild**
                                            **Assistant United States Attorney**
                                            Fla. Bar No.: 0056784
                                            United States Attorney's Office
                                            99 N.E. 4th Street, 3rd Floor
                                            Miami, Florida 33132

Tel.: 305.961.9310
E-mail: clarissa.schild@usdoj.gov
*Counsel for the United States*