# EXHIBIT A

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| UNITED STATES OF AMERICA, ex rel., JANE DOE | PROSTRAKAN, INC, PROSTRAKAN GROUP, PLC, SIMFAROSE PHARMACY, CHARLES BONANNO, RPH, ROSE BONANNO, GALENA BIOPHARMA, INC., and KYOWA HAKKO KIRIN CO. LTD., |

| (b) County of Residence of First Listed Plaintiff _____ | County of Residence of First Listed Defendant __Somerset Cty., NJ__ |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* FILED |
| | NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |

| (c) Attorneys *(Firm Name, Address, Email and Telephone Number)* | Attorneys *(If Known)* |
|---|---|
| The Weiser Law Firm, P.C. | SEP 19 2014 |
| 22 Cassatt Avenue, First Floor | AT 8:30 |
| Berwyn, PA 19312 | WILLIAM T. WALSH CLERK |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1  U.S. Government
  Plaintiff

☐ 3  Federal Question
  *(U.S. Government Not a Party)*

☐ 2  U.S. Government
  Defendant

☐ 4  Diversity
  *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☒ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander | Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans | ☐ 340 Marine | Injury Product Liability | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | ☐ 360 Other Personal | ☐ 380 Other Personal Property Damage | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 195 Contract Product Liability | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 196 Franchise | ☐ 362 Personal Injury - Medical Malpractice | Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| | | | ☐ 790 Other Labor Litigation | | ☐ 895 Freedom of Information Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1  Original
  Proceeding

☐ 2  Removed from
  State Court

☐ 3  Remanded from
  Appellate Court

☐ 4  Reinstated or
  Reopened

☐ 5  Transferred from
  Another District *(specify)*

☐ 6  Multidistrict
  Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity):*
31 U.S.C. § 3729-3733, et seq

Brief description of cause:
Violations of Federal False Claims Act

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions).*

JUDGE _____

DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 09/19/2014 | *James A. Tra* |

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

-------------------------------------------------------- X

UNITED STATES OF AMERICA, *ex rel.*,
JANE DOE,

                   Plaintiffs,

    V.

PROSTRAKAN, INC, PROSTRAKAN
GROUP, PLC, SIMFAROSE PHARMACY,
CHARLES BONANNO, RPH,  ROSE
BONANNO, GALENA BIOPHARMA, INC.,
and KYOWA HAKKO KIRIN CO, LTD.,

                  Defendants.

--------------------------------------------------------

Civil Action No. _____

**Filed Under Seal
Pursuant to
31 U.S.C. § 3730**

RECEIVED

SEP 1 9 2014

AT 8:30_____M
WILLIAM T. WALSH
CLERK

## <u>COMPLAINT OF THE UNITED STATES</u>

The United States of America (the "Government"), by and through their *qui tam* Relator,

Jane Doe ( "Relator"), bring this action under the Federal False Claims Act, 31 U.S.C. § 3729-

3733, *et seq.* (the "False Claims Act" or "FCA") against ProStrakan, Inc. ("ProStrakan"),

ProStrakan Group, Plc. ("ProStrakan Group"); SimfaRose Pharmacy ("SimfaRose"), Charles

Bonanno, Rph, Rose Bonanno, Galena Biopharma, Inc. ("Galena"), and Kyowa Hakko Kirin

Co., Ltd ("Kyowa") (collectively, "Defendants") to recover all damages, penalties, and other

remedies provided by the False Claims Act on behalf of the Government and the Relator, and for

their complaint allege:

     1.     Based on the Relator's personal knowledge and further investigation, sufficient

evidence exists to allege that Defendants have violated and continue to violate the False Claims

Act, 31 U.S.C. § 3729, by submitting fraudulent bills to the government (and/or through its

conduct in causing others to submit fraudulent bills to the government) as a result of kickbacks

and off-label marketing.

## PARTIES

2.      Jane Doe ("Relator") worked for ProStrakan from late-2011 through mid-2013. Relator was one of ProStrakan's Sancuso and Abstral reimbursement managers. In that capacity Relator performed functions similar to a pharmaceutical sales representative.

3.      Plaintiff United States of America, acting through the Department of Health and Human Services ("HHS"), and its Centers for Medicare and Medicaid Services ("CMS"), administers the Health Insurance Program for the Aged and Disabled established by Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq*. ("Medicare").

4.      Defendant ProStrakan Group is a Scotland-based pharmaceutical company that specializes in oncology related medications. Defendant Kyowa of Japan acquired ProStrakan Group in or about February 2011. In the United States, Defendant ProStrakan Group operates as Defendant ProStrakan, with its United States headquarters located in Bridgewater, New Jersey.

5.      SimfaRose is a mail-order pharmacy located at 10016 Pines Boulevard, Pembroke Pines, Florida.

6.      Mr. Bonanno owns SimfaRose. His wife, Mrs. Bonanno, is a SimfaRose employee with no known medical training.

7.      Galena is a pharmaceutical company, based in Portland, Oregon, that develops and commercializes oncology treatments to address major unmet medical needs and advance cancer care.

8.      Kyowa is a research-based life sciences company with special strengths in biotechnology.

## JURISDICTION AND VENUE

9.      Jurisdiction in this Court is proper pursuant to 31 U.S.C. §§ 3732(a) and 3730(b).

This Court also has jurisdiction pursuant to 28 U.S.C. § 1331.

10.   The Court may exercise personal jurisdiction over the Defendants, and venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because the acts proscribed by 31 U.S.C. §§ 3729 *et seq.*, and complained of herein took place in part in this District and the Defendants transacted business in this District as described herein.

11.   Pursuant to 31 U.S.C. § 3730(b)(2), Relator prepared and will serve the complaint on the Attorney General of the United States, and the United States Attorney for the District of New Jersey, as well as a statement of all material evidence and information currently in its possession and of which it is the original source. These disclosure statements are supported by material evidence known to the Relator at the time of filing establishing the existence of Defendants' false claims. Because the statements include attorney-client communications and work product of Relator's attorneys, and will be submitted to those Federal officials in their capacity as potential co-counsel in the litigation, Relator understand these disclosures to be confidential and exempt from disclosure under the Freedom of Information Act. 5 U.S.C. § 552; 31 U.S.C. § 3729(c).

## LEGAL BACKGROUND

### *The False Claims Act*

12.   The False Claims Act provides, in pertinent part:

(a) Liability for Certain Acts.—

(1) In general.— Subject to paragraph (2), any person who—

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

3

(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

(D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

(E) is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(F) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

 (3) Costs of civil actions.— A person violating this subsection shall also be liable to the United States Government for the costs of a civil action brought to recover any such penalty or damages.

(b) Definitions.— For purposes of this section—

(1) the terms "knowing" and "knowingly"—

(A) mean that a person, with respect to information—

(i) has actual knowledge of the information;

(ii) acts in deliberate ignorance of the truth or falsity of the information; or

(iii) acts in reckless disregard of the truth or falsity of the information; and

(B) require no proof of specific intent to defraud;

4

(2) the term "claim"—

    (A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—

        (i) is presented to an officer, employee, or agent of the United States; or

        (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—

            (I) provides or has provided any portion of the money or property requested or demanded; or

            (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

    (B) does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property;

(3) the term "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment; and

(4) the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

13.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 C.S.C. § 2461 (notes), and 28 C.F.R. § 85.1, False Claims Act civil penalties were increased from $5,000 to $11,000 for violations occurring on or after September 29, 1999.

### *The Anti-Kickback Statute*

14.     The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2)(B) ("AKS"), prohibits

offering to pay or paying any remuneration "to any person to induce such person to purchase . . . any good . . . service, or item for which payment may be made in whole or in part under a Federal healthcare program." *Id.* Pursuant to the AKS, it is unlawful to knowingly offer or pay any remuneration in cash or in kind in exchange for the referral of any product (including a prescription drug product) for which payment is sought from any federally-funded health care program, including Medicare and Medicaid. In order to ensure compliance, every federally-funded health care program requires every provider or supplier to ensure compliance with the provisions of the AKS and other federal laws governing the provision of health care services in the United States.

15.     A violation of the AKS constitutes a felony punishable by a maximum fine of $25,000, imprisonment up to five years, or both. Any party convicted under the AKS must be excluded from federal health care programs for a term of at least five years. 42 U.S.C. § 1320a-7(b).

16.     Compliance with the AKS is required for reimbursement of claims from federal health care programs, and claims made in violation of the law are actionable civilly under the FCA. 42 U.S.C. § 1320a-7b(g) (2010) (stating, in part, that a "claim that includes items or services resulting from a violation of . . . [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]. . . ."); *see also United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 315 (3d Cir. 2011) (stating "[c]ompliance with the AKS is clearly a condition of payment under Parts C and D of Medicare" and holding that "appellants, by alleging that appellees violated the AKS while submitting claims for payment to a federal health insurance program, have stated a plausible claim for relief under the FCA."). The AKS was amended in March 2010 as part of the Patient Protection and Affordable Care Act ("PPACA"), which

clarified that all claims resulting from a violation of the AKS are also a violation of the FCA. 42 U.S.C. § 1320a-7(b)(g). The PPACA also amended the Social Security Act's "intent requirement" to make clear that violations of its anti-kickback provisions, like violations of the FCA, may occur even if an individual does "not have actual knowledge" or "specific intent to commit a violation." Public Law No. 111-148, § 6402(h).

17.     Compliance with the AKS is a condition of payment under federal health care programs.  Therefore any violation of the AKS is a violation of the False Claims Act because claims seeking payment for services or prescriptions tainted by kickbacks are either "factually false" or "legally false," and therefore do not meet the conditions of payment from federal health care programs.

### *The Stark Law*

18.     The Stark Law, 42 U.S.C. § 1395nn, *et seq.* (the "Stark Law"), prohibits a pharmaceutical manufacturer from paying remuneration to physicians for referring federal health care beneficiaries to the manufacturer for certain "designated health services," including drug prescriptions, where the referring physician has a nonexempt "financial relationship" with that manufacturer.  42 U.S.C. § 1395nn(a)(1), (h)(6).  The Stark Law provides that the manufacturer shall not cause to be presented a Medicare or Medicaid claim for such prescriptions.  The Stark Law also prohibits payment of claims for prescriptions rendered in violation of its provisions.  42 U.S.C. § 1395nn(a)(1), (g)(1).

19.     Knowingly paying physicians to induce them to prescribe a prescription drug on-label or off-label for individuals seeking reimbursement for the drug from a federal health program or causing others to do so, while certifying compliance with the Stark Law (or while causing another to so certify), or billing the Government as if in compliance with these laws, violates the FCA.

## FACTUAL BACKGROUND

### I.    Overview of Medicare and its Benefits

20.    Medicare is a federal health insurance system for people 65 and older and for people under 65 with certain disabilities.

21.    Medicare Part D began January 1, 2006 and pays for prescription drug benefits for the elderly and disabled.  42 U.S.C. § 1395w-101 *et seq.*  All persons enrolled in Medicare Part A and/or Medicare Part B are eligible to enroll in a prescription drug plan under Part D.  Health and Human Services ("HHS"), through its component agency, the Centers for Medicare and Medicaid Services ("CMS"), contracts with private companies (or "sponsors") authorized to sell Part D insurance coverage.  Such companies are regulated and subsidized by CMS pursuant to one-year, annually renewable contracts.

22.    Medicare Part D requires all participants in the program -- prescription drug plan ("PDP") sponsors, Pharmacy Benefit Managers ("PBM"), and pharmacies -- to adhere to all federal laws and regulations, including those designed to prevent fraud, waste, and abuse.  42 C.F.R. § 423.505(h)(1).  Under CMS regulations, PDP sponsors' subcontracts with PBMs and pharmacies must contain language obligating the pharmacy to comply with all applicable federal laws, regulations, and CMS instructions.  42 C.F.R. § 423.505(i)(3)(v).

23.    The federal government's target is to pay 74.5% of the actual costs of basic prescription drug coverage (as defined at 42 U.S.C. § 1395w-1029(a)(3)).  42 U.S.C. § 1395w-115(a).  Rather than a straight reimbursement, however, the government uses economic incentives and disincentives to encourage both beneficiaries and Part D Plan sponsors to reduce costs.  42 U.S.C. § 1395w-115.

24.    For beneficiaries, the disincentives for running-up high drug expenditures include requiring them to pay certain amounts out-of-pocket (in the aggregate referred to as a

8

beneficiary's True Out-Of-Pocket ("TrOOP")). Those sums include:

      a.    a beneficiary premium equal to 25.5% of the national weighted average plan bid, as adjusted (approximately $350), 42 U.S.C. § 1395w-113(a);

      b.    a deductible defined as 100% of the first $250, as adjusted (although 90% of Part D Plans eliminate the deductible and use a tiered co-pay), 42 U.S.C. § 1395w-102(b)(1);

      c.    thereafter a 25% copay on all costs up to the coverage gap, 42 U.S.C. § 1395w-102(b)(2);

      d.    100% of costs between $2,250 and $3,600, as adjusted, 42 U.S.C. § 1395w-102(b)(3) & (4) (the "coverage gap" or "donut hole"); and

      e.    whereafter, the beneficiary enters the catastrophic coverage phase and only pays a copay of 5%, or $2 for a generic drug and $5 for any other drug. 42 U.S.C. § 1395w-102(b)(4)(A)(i).

25.    Because beneficiaries are required to pay a significant co-pay, and 100% of the cost of drugs while they are in the deductible and coverage gap phases of the program, Medicare Part D provides certain protections to beneficiaries. For example, sponsors must make the negotiated prices available to beneficiaries regardless of what "phase" of the Part D benefit an enrollee is in (*i.e.* deductible, ordinary coverage, coverage gap or catastrophic coverage). In addition, that negotiated price must also remain uniform within a particular pharmacy regardless of what phase of the program the beneficiary is in. Prescription Drug Benefit Manual, Ch. 5 "Benefits and Beneficiary Protections," § 20.6 ("the negotiated price for a particular covered Part D drug purchased at a particular pharmacy must always be the same regardless of what phase of the Part D benefit an enrollee is in").

26.     Another beneficiary protection is that, while they are in the deductible or coverage gap phases where they pay 100% of the costs, they may avail themselves of a cash price that is better than their PDP's negotiated price if the pharmacy is offering a "'special' price or other discount for all customers, or if the beneficiary is using a discount card." Prescription Drug Benefit Manual, Ch. 14 "Coordination of Benefits," § 50.4.2.  If the beneficiary makes such a purchase outside of their plan, their expenditure will still count toward their TrOOP if they report it to their plan. *Id.*

27.     For Part D Plan sponsors, the program is a quasi-free market model that uses a variety of incentives which are part of the structure of the program.  The starting point is that the program only pays the Sponsor "interim payments . . . based on the Secretary's best estimate of amounts that will be payable after obtaining all of the information."  42 U.S.C. § 1395w-115(d)(1).  In other words, Medicare Part D is not a capitated federal insurance program, but rather an actual cost program.  *Id.*; *see also* 42 U.S.C. § 1395w-112(g) (prohibiting states from imposing premium taxes on Part D subsidy since, unlike Part C, the payments are not capitated premiums); *compare to* 42 U.S.C. § 1395w-114(c)(2) (expressly authorizing capitated payment only for those Part D beneficiaries in the lowest income tier who qualify for greater subsidy).

28.     In a nutshell, the sponsor submits a bid based on actuarial data estimating the actual cost of providing prescription drugs to its pool of beneficiaries.  The government then makes "interim payments" to the sponsor on a monthly basis.  As an express condition of receiving those interim payments, the sponsor is required to submit to the government truthful and complete data, including actual cost, for every prescription filled.  At the end of each year the government then compares its interim payments to the actual cost data, and determines whether the sponsor owes a refund to the government, or whether the government is required to

pay more money in order to meet its subsidy target. In order to further incentivize the Sponsor to keep costs down, however, the refund or additional payment is first subject to risk corridors which penalize the Sponsor if actual costs exceed its bid, and reward the sponsor if actual costs are below its bid. 42 U.S.C. § 1395w-115(e). As a practical matter, these risk corridors would only slightly increase or decrease the total percentage paid by the government for each prescription.

## II.    Medicaid

29.    Medicaid is a joint federal-state program created in 1965 that provides health care benefits for certain groups, primarily the poor and disabled. The federal portion of each state's Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on the state's per capita income compared to the national average. 42 U.S.C. § 1396d(b). Among the states, the FMAP is at least 50 percent and is as high as 83 percent.

30.    The Medicaid program pays for services pursuant to plans developed by the states and approved by the HHS Secretary through CMS. 42 U.S.C. § 1396a(a)-(b). States pay doctors, hospitals, pharmacies, and other providers and suppliers of medical items and services according to established rates. 42 U.S.C. §§ 1396b(a)(1), 1903(a)(1). The federal government then pays each state a statutorily-established share of "the total amount expended . . . as medical assistance under the State plan . . . ." *See* 42. U.S.C. § 1396b(a)(1). This federal-to-state payment is known as federal financial participation ("FFP").

31.    The Medicaid programs of all states reimburse for prescription drugs. The vast majority of states award contracts to private companies to evaluate and process claims for payment on behalf of Medicaid recipients. Typically, after processing the claims, these private companies then generate funding requests to the state Medicaid programs. Before the beginning of each calendar quarter, each state submits to CMS an estimate of its Medicaid federal funding

needs for the quarter. CMS reviews and adjusts the quarterly estimate as necessary, and determines the amount of federal funding each state will be permitted to draw down as it incurs expenditures during the quarter. The state then draws down federal funding as actual provider claims, including claims from pharmacies seeking payment for drugs, are presented for payment. After the end of each quarter, the state then submits to CMS a final expenditure report, which provides the basis for adjustment to the quarterly federal funding amount (to reconcile the estimated expenditures to actual expenditures). 42 C.F.R.§ 430.30.

A.    **The Best Price Program**

32.    In 1990, Congress enacted the Medicaid Rebate Program, 42 U.S.C. § 1396r-8, as part of the Omnibus Budget Reconciliation Act of 1990 (hereinafter the "Best Price Program"). The Best Price Program is a cost-savings measure that Congress passed in response to increasing Medicaid expenditures for prescription drugs and requires drug companies to pay rebates to states on their Medicaid purchases.

33.    Pursuant to the Medicaid Rebate Act, participating manufacturers who want their drugs covered by Medicaid must contract with the federal government in a manner that is consistent with Congressional intent in passing the Medicaid Rebate Act. A drug manufacturer must enter into a Rebate Agreement with the Secretary of HHS in order for federal matching funds to be made available for that manufacturer's covered outpatient drugs (the "Rebate Agreement"). 42 U.S.C. § 1396r-8(a)(1). Each participating manufacturer must sign, indicating agreement and compliance with all provisions therein, including that "[t]he Rebate Agreement shall be construed in accordance with federal common law and ambiguities shall be interpreted in the manner which best effectuates the statutory scheme."

34.    The Rebate Agreement provides that the Secretary enters the agreement "on behalf of the Department of Health and Human Services and all States and the District of

12

Columbia (except to the extent they have in force an Individual State Agreement)." Upon entering a Rebate Agreement with the Secretary, the manufacturer must pay a quarterly rebate directly to each participating State based on all of the manufacturer's drugs purchased by that State pursuant to its Medicaid plan during that quarter.

35.     The rebate provided to the states is the greater of: (1) the difference between the Average Manufacturer Price ("AMP") and best price; and (2) 23.1 percent of the AMP. 42 U.S.C. § 1396r-8 (c)(1).

36.     Drug manufacturers are required under the Medicaid Rebate Statute and Rebate Agreement to calculate and report their AMPs and best prices to the Secretary on a quarterly basis. 42 U.S.C. § 1396r-8(b)(3)(A)(i). AMP is defined as the average price paid to the manufacturer for the drug in the United States by: (i) wholesalers for drugs distributed to retail community pharmacies; and (ii) retail community pharmacies that purchase drugs directly from the manufacturer. 42 U.S.C. § 1396r-8(k)(1)(A).

37.     In addition, "Best Price" means "with respect to single source drug or innovator multiple source drug of a manufacturer . . . the lowest price available from the manufacturer during the rebate period to any wholesaler, retailer, provider, health maintenance organization, nonprofit entity, or governmental entity within the United States . . . ." 42 U.S.C. § 1396r-8(c)(1)(C). "Best Price" is "inclusive of cash discounts, free goods that are contingent on any purchase requirements, volume discounts, and rebates . . . ." *Id.*

38.     The information provided by the manufacturer under the Rebate Agreement is to be complete and accurate. Pursuant to Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, and Section 1927(b)(3)(C)(ii) of the Social Security Act, the Secretary could impose penalties of up to $100,000 for each item of false information knowingly provided by the

manufacturer.

39.    States are required to report their total Medicaid drug utilization to each manufacturer and the Secretary sixty days after the end of the rebate quarter.  42 U.S.C. § 1396r-8(b)(2)(A). Using the manufacturer pricing data, CMS computes the unit rebate amount ("URA") "to which the Medicaid utilization information may be applied by States in invoicing the Manufacturer for the rebate payment due."  Rebate Agreement at § I(dd).  Using the Medicaid drug utilization data, manufacturers calculate and pay the States the rebates they believe are due and owing to each State.

### III.    The United States Food, Drug, and Cosmetic Act

40.    The United States Food and Drug Administration ("FDA") regulates drugs based on the "intended uses" for such products.  Before marketing and selling a prescription drug, a manufacturer must demonstrate to the FDA that the product is safe and effective for each intended use.  21 U.S.C. §§ 331(d), 355(a).

41.    The United States Food, Drug and Cosmetic Act ("FDCA") establishes the framework for regulation of, *inter alia*, the sales and marketing activities of pharmaceutical manufacturers in the United States, including the introduction of new drugs into interstate commerce.  When the FDA approves a drug, it approves the drug only for the particular use for which it was tested.  While a physician may prescribe a drug for a use other than the one for which it is approved, the FDCA prohibits a drug manufacturer from marketing or promoting a drug for non-approved uses.  21 U.S.C. §§ 331(d), 355(a).  It therefore is illegal for a drug manufacturer and its sales representatives to initiate discussions with medical professionals regarding any off-label use of a drug.

IV. **Defendants' Fraudulent Conduct**

A. **False Claims Act Violations**

42.     Defendants have, since at least September 2011, engaged in off-label marketing and in an unlawful kickback scheme with respect to the drugs Sancuso and Abstral that was intended to, and did in fact, induce physicians to improperly prescribe these medications. These prescriptions were reimbursed by federal health care programs, including Medicare and Medicaid, and therefore were issued in violation of the AKS, the Stark Law and the FCA. As a result of Defendants' misconduct, the Government has been defrauded and suffered a substantial loss.

43.     Sancuso is a drug, dispensed as a patch, designed to protect against chemotherapy induced nausea and vomiting ("CINV"). Sancuso is only indicated as a "serotonin subtype 3 (5-HT3) receptor antagonist indicated for the prevention of nausea and vomiting in patients receiving moderately and/or highly emetogenic chemotherapy for up to 5 consecutive days." Sancuso retails for approximately $365 per patch.[1]

44.     Abstral is a sublingual, fentanyl-based rapid onset opioid ("ROO") tablet designed to treat breakthrough cancer pain in patients already being treated with opioids. According to its package insert, Abstral is "indicated for the management of breakthrough pain in cancer patients 18 years of age and older who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain" but is "contraindicated in the management of acute or postoperative pain, including headache/migraine, dental pain, or use in

---

[1] A survey of the relevant literature and guidelines appears to indicate that while Sancuso is approved solely for use in patients undergoing moderately and/or highly emetogenic chemotherapy regimens of ≤ 5 consecutive days duration, its active ingredient, granisetron, is covered when used to prevent post-operative/anesthesia nausea and vomiting where the patient is already taking the drug or where he or she is intolerant to or non-responsive to other anti-emetics. No other approved or covered uses for Sancuso were discovered by Relator.

the emergency room." Moreover, Abstral is "intended to be prescribed only by healthcare professionals who are knowledgeable of, and skilled in, the use of Schedule II opioids to treat cancer pain." Abstral is available in doses of 100, 200, 300, 400, 600, and 800 mcg. Abstral retails for approximately $65 per tablet.[2]

45. By way of background, fentanyl, the active ingredient in Abstral is a potent opioid. The only opioid stronger than fentanyl regularly used in humans is sufentanil – a drug so strong that it is primarily administered intravenously during surgery at a physician's direction. Given its obvious strength, the use of fentanyl is not something taken lightly. Fentanyl, and especially transmucosal immediate-release fentanyl ("TIRF") products like Abstral, are subject to an FDA Risk Evaluation and Mitigation Strategy ("REMS"). This is not surprising: fentanyl presents substantial risks. According to the Centers for Disease Control and the Drug Enforcement Agency, it is 50–100 times stronger than morphine, and was responsible for approximately 30% of the unintentional overdose deaths reported during November 2013–March 2014 in the United States. *See* Centers for Disease Control and Prevention, Morbidity and Mortality Weekly Report, Vol. 63, No. 24 at 531 (June 20, 2014). Given as much, it is extremely important that these risks be mitigated, so that appropriate and therapeutic use of such drugs can be achieved.

46. The FDA recognizes that TIRFs present substantial dangers – so much so that physicians who would like to prescribe them are required to certify their expertise and

---

[2] A survey of the relevant literature and guidelines indicates that not only is Abstral only available through the TIRF REMS Access program but that, because of the profound risk of fatal overdose due to the substantial differences that exists in the pharmacokinetic profile of Abstral compared to other fentanyl drugs, Abstral is specifically contraindicated for substitution for other fentanyl-containing products. No approved or covered uses for Abstral – save treating breakthrough pain in cancer patients who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain – were discovered by Relator.

compliance with a host of conditions designed to minimize the risks of overdose, addiction, and death. Most notably, the FDA TIRF REMS specifically requires that physicians certify, before they can prescribe a TIRF medicine, that: "I understand that TIRF medicines are indicated only for the management of breakthrough pain in patients with cancer, who are already receiving, and who are tolerant to, around the clock opioid therapy for their underlying persistent pain."

47.     Accordingly, it is clear that the off-label prescription and use of Abstral – on which ProStrakan and Galena expressly depend for the majority of their revenue from the drug – presents a serious and continuing safety risk to the public.  As if marketing this dangerous drug to patients for which it was not intended is not dangerous enough, ProStrakan and Galena have and continue to up the stakes by basing sales representatives' compensation on the amount of Abstral they convince physicians to prescribe.

48.     On January 1, 2013, Orexo, a specialty pharmaceutical company with commercial operations in the United States, and Research and Development in Sweden, acquired the rights to sell and distribute Abstral in the United States from ProStrakan Group.  On March 18, 2013, Galena acquired Abstral's United States sales and distribution rights from Orexo.

### 1.     ProStrakan Marketed Sancuso and Abstral for Off-Label Use

49.     As discussed in more detail, below, ProStrakan actively marketed the off-label use of its drugs Sancuso and Abstral, in violation of the FDCA, the AKA, and the FCA.  The FDA regulates the marketing approval or clearance, labeling, and promotion of pharmaceutical, medical device, and biologic products in the United States.  These products may only be labeled, promoted, and advertised for the uses that the FDA has approved or cleared.  Specifically, ProStrakan encouraged and facilitated the marketing of Sancuso and Abstral to non-cancer treating physicians for treatment of non-cancer patients, in violation of the explicit limitations placed upon these drugs by the FDA.  ProStrakan facilitated its fraud through its sales

17

representatives and SimfaRose, as well as by offering free services to prescribing physicians to ensure that their prescriptions cleared the government's prior authorization process.

<strong>a.    ProStrakan Trained Its Sales Representatives To Market Sancuso and Abstral For Off-Label Use</strong>

50.    ProStrakan trained its sales representatives to promote Sancuso and Abstral to physicians for off-label use. Specifically, ProStrakan instructed its sales representatives to target their sales and marketing efforts on physicians treating patients without cancer. ProStrakan engaged in this conduct despite Sancuso's and Abstral's indications, which provide that the drugs are only for use in cancer patients.

51.    Sales representatives were the core of ProStrakan's off-label marketing scheme. According to Relator, ProStrakan's most senior executives did everything they could to ensure that Sancuso and Abstral were marketed and sold off label. For example, in an October 2011 email from ProStrakan's Northeast United States District Sales Manager, Jeff Aromando, all sales representatives within his district were provided a list containing the 2,880 "top prescribers of antiemetics and ROOs" so that they could target those physicians. Significantly, 98% of the physicians on the list did not have, belong to, and were not associated with practices that treat cancer patients. Providing this list to its sales representatives proved very successful in increasing revenues and furthering ProStrakan's off-label marketing scheme. Indeed, according to Relator, ProStrakan's sales representatives targeted these non-cancer treating physicians and promoted both Sancuso and Abstral to them for off-label purposes.

52.    One of the ways that Prostrakan engages in off-label marketing is by providing extensive samples of its drugs to physicians who do not treat patients with CINV. According to Relator, because physicians receiving samples must "sign" for them, she was instructed by ProStrakan management to make sure that when she wanted to give samples of Sancuso to a

18

physician who did not treat cancer patients she needed to make sure that he or she did not actually sign for the samples. Instead, she was instructed to have an oncologist sign for a given number of samples, and then she was to deliver half of the samples to each physician. In this manner, ProStrakan was able to provide free samples to non-oncologists without alerting regulators.

53.     One of the doctors to whom ProStrakan extensively and successfully promoted Sancuso for off-label use was Henry Parkman, M.D., a Philadelphia area gastroenterologist. Dr. Parkman now consistently prescribes hundreds of Sancuso patches per week for symptoms caused by gastroparesis. Relator specifically recalls that Dr. Parkman was one of the doctors to whom free samples of Sancuso were provided, but that the samples he received were signed for by an oncologist in accordance with the foregoing scheme. Relator, concerned that this arrangement may violate the prohibition on off-label marketing, complained to her manager. Upon learning of Relator's concerns, ProStrakan management pulled Dr. Parkman's account from her, and made it a "house account" managed by Sue Smith, ProStrakan's marketing director.

54.     In addition to promoting Sancuso for off-label use to non-oncologists, ProStrakan also instructed its sales representatives to promote Sancuso for off-label use by oncologists. Specifically, Sancuso patches are approved by the FDA to be used "for up to 5 consecutive days." Despite its explicit indication, ProStrakan, in an attempt to make its product more appealing to physicians and to capture market share, trained its sales representatives to inform physicians that each Sancuso patch provides the desired relief for up to seven days.

55.     ProStrakan's express focus on physicians that do not treat cancer patients represents a *prima facia* case of illegal off-label marketing. Because Sancuso is only approved

to treat CINV in patients receiving moderate-to-high emetogenic chemotherapy, the direct targeting and marketing to doctors that have no cancer patients can be nothing else.

### b.   ProStrakan Used and Marketed SimfaRose to Promote Sancuso Off-Label Prescriptions

56.   As noted, above, SimfaRose is a mail-order pharmacy located in Pembroke Pines, Florida. SimfaRose was closely associated with ProStrakan, and Defendants utilized it as a means to encourage physicians to prescribe Sancuso. Specifically, ProStrakan used SimfraRose as a marketing tool to encourage physicians to prescribe Sancuso for off-label use by addressing the difficulties of securing coverage for prescriptions of this drug. Sancuso is indicated *only* for treatment of cancer patients. Due to this indication, as well as ProStrakan's targeting of physicians who do not treat cancer patients, ProStrakan used SimfaRose to alleviate the concerns of physicians by ensuring that non-cancer patients would receive prior authorization from insurance companies and government health care programs.

57.   SimfaRose was very successful at obtaining prior authorization for off-label Sancuso. According to Relator, almost 100% of the prior authorization requests submitted by SimfaRose for Sancuso prescriptions were approved.

58.   For the purposes of this case, it is important to note that SimfaRose receives a large amount of business as a result of being ProStrakan's "preferred pharmacy" for filling Sancuso prescriptions. As a result, SimfaRose has a substantial incentive to engage in the fraud: it logically follows that if it did not do so, ProStrakan would simply find another pharmacy willing to go along with the scheme, and SimfaRose would lose a substantial amount of business.

59.   As discussed, below, SimfaRose was willing to do virtually anything to ensure that it continued to be ProStrakan's "preferred pharmacy."

### i.   ProStrakan Used SimfaRose as a Marketing Tool to Convince Physicians to Prescribe Medications Off-label

60.    As a preliminary matter, ProStrakan used SimfaRose as a marketing tool to convince physicians to write prescriptions.  That is, because of the limited indicated uses of Sancuso, securing approval and coverage for these drugs can be difficult if the patient does not have cancer and CINV.  And physicians know this.  Given as much, ProStrakan promised physicians that patients could have their prescriptions filled through SimfaRose, which would: (1) guaranteed that patients without cancer would obtain prior authorization for prescriptions that should have been denied; and (2) perform (in lieu of the physician) the administrative responsibilities associated with obtaining prior authorization for prescriptions.

61.    To provide some background, prior authorization is a feature required by insurers and Medicare/Medicaid to ensure that certain drugs are prescribed appropriately.  Prior authorization helps to ensure that these drugs are used correctly and *only* when necessary.  In other words, insurers and Medicare/Medicaid require prior authorizations to prevent improper prescribing or use of certain drugs that may not be the best choice for a particular health condition.  When a patient brings a prescription which requires prior authorization to the pharmacy to be filled, the pharmacist is notified that prior authorization is required.  The pharmacist will then contact the patient's physician, who contacts the insurer to submit additional information, typically in the form of a letter of medical necessity ("LMN") for the prescription. The insurer will then either grant authorization, and pay for the prescription, or deny authorization, in which case the physician can either appeal the insurer's decision or prescribe a different medication. Typically, when a patient is prescribed a medication for its indicated use, obtaining prior authorization is relatively simple. When a physician prescribes a medication for off-label use, however, obtaining prior authorization can be much more difficult.

62.    SimfaRose helped Defendants increase their market share for Sancuso and Abstral

21

by making it easier for physicians to prescribe Sancuso for off-label uses by virtually guaranteeing that these off-label prescriptions would receive authorization. SimfaRose did this in several ways. In addition to drafting a canned letter of medical necessity (discussed below) for physicians, SimfaRose also handled all aspects of the prior authorization process.

63.     By guaranteeing prior authorization for Sancuso prescriptions, SimfaRose was able to significantly mitigate a major concern of physicians considering prescribing the drug off-label. That is, physicians are often hesitant to prescribe drugs, off-label, due to concerns that the patient may not receive prior authorization for the prescription and therefore be unable to obtain their medication in a timely fashion. Another deterrent to prescribing medications off-label is the administrative requirements physicians must perform to receive prior authorization for off-label prescriptions. SimfaRose eliminated both of these concerns. When SimfaRose received a prescription, it would contact the patient's insurance carrier in order to obtain prior authorization. It would further submit any necessary documentation (typically a LMN as well as other paperwork) and await the response.

64.     According to Relator, ProStrakan expressly trained its sales representatives to make sure that they touted these benefits to physicians when promoting Sancuso for off-label use.

> **ii.      SimfaRose Engaged in Fraudulent Conduct to Ensure Off-Label Prescriptions Were Filled**

65.     In addition to the foregoing, ProStrakan and SimfaRose also colluded to develop schemes to ensure that as many Sancuso prescriptions were filled as possible.

66.     One scheme employed by SimfaRose was to falsely certify that it had a prescription for Sancuso in order to refill a patient's prescription. Prescriptions are normally sent to a pharmacy from the prescribing physician electronically, by fax, or the physician can simply

call the prescription in to the pharmacy.  When a prescription is called in, the pharmacist makes a record that the physician called in the prescription.  But SimfaRose would refill patients' Sancuso prescriptions without first obtaining the prescription from the physician.  This typically occurred through SimfaRose's "patient follow-up service."  SimfaRose's patient follow-up service was simply Mrs. Bonanno, who, upon information and belief, has no medical training, speaking with patients about their experiences with Sancuso.  After listening to the patients' experiences with these drugs, Mrs. Bonanno would almost always recommend that the patients "need more [Sancuso] patches."  Rather than contacting the patient's physician, and obtaining a prescription for the refill, SimfaRose would simply dispense the drug (based on the statement of an independent pharmacist consulted by counsel, to do so, SimfaRose could easily accomplish this end by creating a false record stating that the patient's physician called in a prescription for the drug).  Then, SimfaRose would provide the patient with the medication, notwithstanding the fact that no prescription was ever obtained and the patient's physician was never contacted.  The patient's insurer, or Medicare/Medicaid, would then be billed for the prescription.

67.     ProStrakan also colluded with SimfaRose to create a "work around" for the existing treatment prerequisites required by some insurance providers before they will reimburse prescriptions for Sancuso.  To provide some background, many health insurance providers and Medicare/Medicaid require "step therapy," which requires a "step edit" before a drug will be covered.  If a step edit is required, this means that the drug requires a prescription history of specific drugs in the patient's pharmacy claims or data system, and these specific drugs must have been administered to the patient within a certain time frame.  After the specified drugs have been taken within the given time frame, the insurance company will cover the newly-prescribed drug.  This, purportedly, ensures that physicians will not simply skip intermediate treatments that

may be effective before prescribing the most expensive drug to treat a particular condition.

68. Due to the limited indications for Sancuso and Abstral, many insurance providers would require, before covering the prescription, that the patient have been prescribed to a different medication which failed to provide the anticipated relief. For example, Abstral is approved only for those "who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain" primarily due to the risk of "life-threatening respiratory depression" as "death could result at any dose in patients not on a chronic regimen of opioids." Due to the requirement that patients be tolerant to opioid therapy as a result of current opioid treatment, and the potential severe health risks associated with non-opioid tolerant patients taking Abstral, many insurance providers require that, before they will pay for an Abstral prescription, the patient have previously undergone treatment with less potent (and cheaper) opioids. To get around this requirement, ProStrakan would advise its sales representatives to instruct physicians to write "dummy prescriptions," meaning prescriptions which were never intended to be filled, for less potent opiods, in order to create the appearance that opioid therapy had been tried but was insufficient.

69. ProStrakan used a similar scheme for Sancuso. When an insurance provider or Medicare/Medicaid required that a patient have a specific prescription drug treatment history before it would pay for their Sancuso prescription, SimfaRose – with the knowledge of ProStrakan – would falsify a prescription to satisfy the existing treatment requirement. According to Relator, Mr. Bonanno would personally write a prescription for a drug that satisfied the patient's preexisting treatment requirement. Then, he would state that the drug failed, and write and fill a prescription for Sancuso.

24

  c.  **ProStrakan Provided Physicians With A "Canned" Letter of Medical Necessity to Encourage Physicians to Prescribe Sancuso Off-Label**

  70. According to Relator, ProStrakan management also facilitated the off-label marketing of Sancuso by providing physicians with canned LMNs.  To provide prescribing physicians with assurance that their patients would receive prior authorization for off-label prescriptions, ProStrakan provided its sales representatives and other staff with a standardized "canned" LMN to be distributed to prescribing physicians.  As stated above, when an insurer or Medicare/Medicaid requires prior authorization before it will pay for a prescription drug, the prescribing physician typically submits an LMN outlining why the drug is medically necessary for the patient's treatment. Obviously, these letters must be patient specific, as the letter is meant to establish that a particular drug is medically necessary to treat a particular patient.

  71. According to Relator, the LMNs drafted by SimfaRose were far more than mere "fill in the blank" or "check the boxes" forms.  Instead, and because each insurer/payer has different requirements for LMNs, Relator states that SimfaRose drafted custom LMNs for each insurer/payer that were then either sent from SimfaRose or merely rubber stamped by physicians.  Relator further states that to ensure that prescriptions for Sancuso (which required step-edits) were approved, SimfaRose instructed physicians to write a prescription for one dose of whatever medication was required before Sancuso would be covered, and at the same time write the prescription for Sancuso on the basis that the other drug was ineffective.

  72. Defendants also deceived patients' physicians into using the form LMN. According to Relator, ProStrakan instructed its sales representatives to tell doctors that the canned LMN had been written by a physician. But in reality the canned LMNs were authored by Mr. Bonanno, who was a pharmacist, not a physician.

  73. Fraudulently representing that Mr. Bonanno was a physician, when, in reality, he

was a pharmacist, helped ProStrakan convince physicians to prescribe Sancuso off-label. Many of the physicians targeted by ProStrakan's sales representatives were hesitant to prescribe Sancuso to their non-cancer patients. One of their major concerns was whether their non-cancer patients would receive prior authorization from their insurance companies or Medicare/Medicaid for the drug. ProStrakan sought to alleviate these concerns by providing physicians with the canned LMN. Sales representatives were trained to tell physicians that a ProStrakan physician prepared the form LMN, and, based on the physician's experience, it would almost guarantee that prior authorization would be granted. As a result of this misrepresentation, some physicians would prescribe Sancuso, confident that a physician familiar with the prior authorization process for these drugs had prepared the LMN. However, had these physicians known the truth – that the canned LMN was drafted by a pharmacist – they would not have had confidence that the letter would achieve prior authorization, as it was not drafted by an experienced physician, and would therefore have been hesitant to rely on it, or even use it, to obtain prior authorization.

74.     The foregoing serves to further support a finding that ProStrakan acted with fraudulent intent: a "canned" LMN is unnecessary if a prescription is being written for a drug to treat an indicated condition. Thus, a physician seeking prior authorization for a given drug's approved use would not need the canned LMN – he or she would only need to write the actual patient symptoms, mainly that the patient has cancer and is opioid-tolerant (in the case of Abstral) or has CINV from undergoing chemotherapy (in the case of Sancuso) and prior authorization would be virtually assured.

>           **2.      ProStrakan Trained and Required its Sales Representatives to Encourage Prescriptions be Filled Through SimfaRose because of its Willingness to Honor Copay Coupons Used by Medicare Beneficiaries in Violation of the Anti-Kickback Statute**

75.     The use of copay coupons provided by pharmaceutical manufacturers to

government health care beneficiaries to obtain prescription drugs violates the AKS. *See* OIG Advisory Opinion No. 97-4 (Sept. 25, 1997) ("an inference can be drawn that the Proposed Arrangement's waiver of the Medicare Copayment for reasons unrelated to individualized financial hardship may unlawfully induce patients to purchase services from Center B that are reimbursable by Medicare."). By waiving copayments, drug manufacturers cost government health care programs millions of dollars. *See* OIG Advisory Opinion No. 03-3 (Feb. 3, 2003) ("Since beneficiaries would be insulated from their financial liability for the Requestor's Drugs, there would be no incentive to use competing, equally effective products, even if they were less expensive."). Moreover, a 2011 study released by the Pharmaceutical Care Management Association found that "If Medicare's ban on copay coupons were not enforced, costs to the Part D program would increase by \$18 billion over the 2012-21 period." *See How Copay Coupons Could Raise Prescription Drug Costs By \$32 Billion Over the Next Decade*, Pharmaceutical Care Management Association (Nov. 2011).

76. Indeed, according to OIG's Work Plan For Fiscal Year 2014:

> Copayment coupons may create an incentive for beneficiaries to choose more expensive brand-name drugs over lower-cost generic drugs. A recent survey suggests that beneficiaries are using copay coupons to obtain specific brand-name prescription drugs, causing Medicare to pay more than necessary when less costly versions of the same drugs are available. The use of copayment coupons in Federal health care programs implicates the anti-kickback statute.

77. Defendants have violated the AKS by providing (in the case of ProStrakan) and honoring (in the case of SimfaRose) copay coupons to government health care beneficiaries in connection with Sancuso and Abstral prescriptions. Specifically, ProStrakan offered "Copay Assistance Coupons" and other coupons for Sancuso and Abstral. For Sancuso, ProStrakan offered a "Copay Assistance Card" which covered a patient's copay amount, after the first \$20 is paid by the patient, up to \$150 per month. For Abstral, ProStrakan offered a voucher and a "Co-

Pay Card." The voucher allows patients to receive one free box (32 tablets) of Abstral, and patients can receive a maximum of three free boxes within the first 30 days. The Co-Pay Card covers up to $500 of out-of-pocket expenses for each Abstral prescription.

78.     That ProStrakan is aware that it is illegal for federal health care beneficiaries to use the coupons it offers in connection with its promotion of both Sancuso and Abstral is beyond credible dispute: the coupons for both Sancuso and Abstral all state "Offer not valid for prescriptions under Medicaid, a Medicare drug benefit plan, Veterans Administration, DOD, TRICARE, or other federal or state programs (such as medical assistance programs). If you are eligible for drug benefits under any such program, you cannot use this card." Yet, despite this explicit acknowledgement of its illegality, ProStrakan encourages federal health care beneficiaries to use its coupons to purchase Sancuso and Abstral by stating that the cards are honored by SimfaRose.

79.     Through ProStrakan's practice of providing copay coupons to federal health care beneficiaries and directing them to SimfaRose to honor these coupons, it has provided remuneration which it intended to, and did in fact induce patients to purchase Sancuso and Abstral, which were reimbursed by federal health care programs, in violation of the AKS. Therefore, prescriptions for Sancuso and Abstral were reimbursed by government health care programs in violation of the AKS and FCA. The benefits of this arrangement for ProStrakan and SimfaRose are clear: they each sell more of both Sancuso and Abstral because they can be offered at a lower out-of-pocket cost to federal health care beneficiaries.

80.     To facilitate this arrangement, ProStrakan senior management puts great pressure on its sales representatives to convince prescribing physicians to encourage their patients to fill their Sancuso and Abstral prescriptions through SimfaRose. According to Relator, to track sales

representatives' success at ensuring prescriptions were filled through SimfaRose, and to apprise sales representatives of the fact that the quantity of prescriptions they directed to SimfaRose was closely monitored, ProStrakan senior management sent out a weekly email listing the sales representatives that had the most prescriptions filled through SimfaRose.

81.     ProStrakan's determination to direct Sancuso and Abstral prescriptions to SimfaRose was so great that even its own sales representatives began to question it.  According to Relator, during a company conference in Louisiana, ProStrakan's *own* sales representatives questioned why they were supposed to steer patients to SimfaRose, located in Florida, when local pharmacies could fill the prescriptions *and* were more convenient for the patients. Concerned that its prohibited arrangement with SimfaRose might be uncovered, ProStrakan management, for the first *and only time* according to Relator, backed away from its requirement that all sales representatives steer patients to SimfaRose.  Instead, ProStrakan management provided sales representatives with the names of three alternative pharmacies (located in the east, north, and west regions of the country) through which prescriptions for the drugs could be filled.

### 3.     **ProStrakan's Best Price Violations**

82.     ProStrakan also violated the False Claims Act by secretly providing SimfaRose with discounted prices for Sancuso and Abstral, and, as a result, has underpaid its rebate obligation under the Medicaid Drug Rebate Program.   As stated above, pharmaceutical manufacturers must provide certain information – including the real prices for its drugs – in order to determine the correct rebate to provide states which reimburse Medicaid patients for its drugs.    But, according to Relator, ProStrakan regularly discounted the price it charged SimfaRose and, on belief, did not disclose this to the government.

### 4.     **Violations of the False Claims Act By Galena**

83.     As noted, above, on January 1, 2013, Orexo acquired the rights to sell and

distribute Abstral in the United States from ProStrakan Group. Shortly thereafter, on March 18, 2013, Orexo sold those rights to Galena. As shown, below, Galena continued ProStrakan's course of fraudulent conduct by: (i) marketing Abstral for off-label use; and (ii) paying illegal kickbacks to to physicians for prescribing Abstral.

### a. Galena Engaged in Off-Label Marketing of Abstral

84. According to Confidential Witness 1 ("CW1"), a former Territory Business Manager for Galena, and Confidential Witness 2 ("CW2") (collectively, "CWs"), who worked as an Abstral sales representative at Galena from July 2013 until September 2013, since at least July 2013, Galena has engaged in off-label marketing of Abstral. Galena accomplished this mainly through its sales representatives, which it trained to, among other things, target physicians who do not treat cancer patients.

85. CW1's managers, specifically Scott MacKenzie (Regional District Manager) and Christopher Lento made it clear that his marketing efforts for Abstral were to be focused on off-label prescriptions. According to CW1, in several meetings, MacKenzie and Lento would repeatedly state that 80% of the market for ROOs, such as Abstral, is off-label, and therefore sales representatives should target the off-label market to increase market share.

86. Galena tracked the volume in which physicians were prescribing Abstral through REMS reports. Every pharmacy and physician has an associated REMS ID. Galena used the REMS IDs of physicians and pharmacies to determine which physicians were prescribing Abstral and which pharmacies were filling the prescriptions. This information was then put in to reports and distributed to sales associates.

87. MacKenzie and Lento did everything they could to capture as much of the off-label market as possible. According to CW1, MacKenzie regularly told sales representatives that they needed to increase sales "by hook or by crook," implicitly suggesting that engaging in

illegal conduct to increase sales was looked favorably upon at Galena.

88.     Indeed, due to Galena's belief that the "real money" was in the off-label market, MacKenzie regularly told CW1, as well as other sales staff, not to "waste time" marketing to oncologists because they "take too long [to prescribe pain medication]." For example, to assist Galena's sales representatives promote Abstral for off-label purposes, MacKenzie provided CW1 and his sales staff with sales data and lists of top prescribers of ROOs in order to help them target physicians. Significantly, almost all of the physicians on the list were pain management doctors who did not treat cancer patients. Moreover, according to CW1, he "had to get to page 2 of [the] Excel spreadsheet to find [the] first oncologist."

89.     A selection of the off-label marketing attempts that CW1 made, on the instructions of MacKenzie, demonstrates Galena's desperation to sell Abstral by any means:

1.     Louis Spagnoletti, M.D. (Physical Medicine and Rehab; Marlton, NJ). Galena enrolled Dr. Spagnoletti, a major prescriber of Abstral competitor Subsys, into its speaker program (discussed below). As a Galena speaker, he was sent to an advisory board meeting in Atlanta, which included a two day stay at the Ritz Carlton and a $5,000 payment. Upon information and belief, Dr. Spagnoletti was selected for a speaker position as an inducement to convince him to start prescribing Abstral to his patients. Notwithstanding Galena's more than generous speaker fee and travel arrangements, Dr. Spagnoletti did not prescribe Abstral to his patients, to the displeasure of Lento and MacKenzie. Lento and MacKenzie were also upset with CW1 over Dr. Spagnoletti's failure to prescribe Abstral off-label, as discussed in more detail, below.

2.     Randall Smith, M.D. (Orthopedic Pain Management; Philadelphia, PA). MacKenzie instructed CW1 to target Dr. Smith because data showed that he was the area's heaviest prescriber of Subsys. Despite CW1's efforts, Dr. Smith did not prescribe Abstral.

3.     Nicholas G. Palladino, M.D. (Internal Medicine; Sicklerville, NJ). CW1 was instructed to target Dr. Palladino, even though he did not treat cancer patients. When CW1 spoke with Dr. Palladino, he was told that he was the first sales representative to even mention the word "cancer." Dr. Palladino did not prescribe Abstral to his patients.

90.     CW2 experienced similar pressure to target non-cancer treating physicians while at Galena. According to CW2, his managers, Lento and J.T. Hostler, Galena's West Coast Sales

Manager, "just wanted scripts [for Abstral]" and did not care whether the prescriptions were for on or off label use.  CW2 confirms the statements of CW1 – Galena's marketing strategy was to target all patients – not just those with cancer.  To achieve this end, CW2, and the four other pre-launch sales representatives were combined into a group called the "pre-launch group."  The pre-launch group was instructed to call on any and all physicians prescribing Subsys or Fentora.  The plan, according to CW2, was to develop relationships with prime targets to sell Abstral even before the formal launch by Galena.  To carry out this plan, Galena management placed a lot of pressure on CW2 to target high volume writers of ROOs – most of which were pain management doctors whom did not see cancer patients.

91.    According to CW2, he was constantly pressured by senior management at Galena to market Abstral to pain doctors, in general, and Subsys and Fentora writers in particular.  For example, on September 19, 2013, Galena held its first sales meeting for the Western District in Denver.  During this meeting, CW2 was instructed to target Subsys writers, as well as the top ten prescribers of ROOs in the District.  Galena's top competitors in the ROO market, primarily the sellers of Fentora and Subsys, were also discussed at the meeting.  According to CW2, a high percentage of the doctors on the list of the highest prescribers of ROOs were pain management doctors who did not treat cancer patients.   In discussing the list during the meeting, no consideration was given to whether or not the pain doctors on the list actually treated cancer patients.  Indeed, according to CW2, the message from Galena management at the meeting was clear: call on these high volume prescribers of ROOs because they have a history of prescribing ROO products in high volume and would be likely to prescribe Abstral for off label use.

92.    Despite MacKenzie's and Lento's explicit instructions to promote Abstral for off-label use, they also were very concerned about hiding the focus of its marketing efforts.  For

example, according to CW1, Galena senior management made sure that all written communications (training materials, emails etc.) to sales representatives discussing the promotion of Abstral stated that the drug was only to be marketed to cancer patients. Such directives, however, were nothing more than a formality, which everyone understood was to prevent detection of Galena's off-label marketing scheme.

93.   CW2 believes that he was ultimately terminated, in large part, as a result of his unwillingness to market Abstral off-label. CW2 was fired shortly after the pre-launch meeting. Prior to his termination, CW2 had no sense that others within the company were dissatisfied with his performance.  But CW2 had regularly questioned Galena management's instructions to market off-label and, for the most part, only called on oncologists, and he believes this was the core reason why he was terminated.

94.   Similar to ProStrakan, Galena tried to implement a prior authorization process to ease the concerns of physicians considering prescribing Abstral off-label.  In March 2014, Galena retained Aureus, a third party, to handle the prior authorization program, which was entitled Galena Patient Services, or GPS. Aureus, however, had little success obtaining prior authorization for Abstral prescriptions.  Upon information and belief, Aureus' failure in obtaining prior authorization for Abstral prescriptions was due to the fact that Aureus tried to obtain prior authorizations legitimately, and would not engage in prohibited conduct. Therefore, the combination of Abstral being prescribed primarily off-label, thereby making prior authorization harder to obtain, and Aureus' unwillingness to engage in fraudulent conduct, resulted in significantly less-than-expected prior authorizations.

### b.   Galena was Warned that Its Conduct was Illegal

95.   In addition to the foregoing warnings, CW1, on several occasions, asked MacKenzie "don't you think calling on pain docs [rather than oncologists] is a bad idea?"  On

almost every occasion that CW1 asked this question, MacKenzie responded by stating "everyone else is making money doing it [off-label marketing], [so] why aren't you?" Not only does this statement demonstrate MacKenzie's belief that off-label marketing is commonplace in the pharmaceutical industry, but it also demonstrates the corporate culture at Galena – that off-label marketing is "how business is done" and the corporate prerogative is not to prevent such conduct, but simply to avoid getting caught. In fact, upon information and belief, like CW2, CW1 was eventually fired as a direct result of his repeated questioning of Galena's directives to engage in prohibited off-label marketing.

### c.    Galena Violated the Anti-Kickback Statute

96.    In addition to violating the FCA through off-label marketing, Galena also violated the AKS and the Stark Law by providing remuneration to physicians in order to induce them to prescribe Abstral. Galena disguised its illegal kickbacks using two vehicles: (1) its speaker program; and (2) its Abstral Relief Registry.

### i.    Galena's Speaker Program

97.    Galena, through its speaker program, provided remuneration, as defined in the AKS, to induce physicians to prescribe Abstral to their patients. Speaker positions with Galena usually entailed a significant fee (or kickback) paid to the physician, under the guise of "honoraria," as well as travel expenses and a stay at a fancy hotel.

98.    According to CW1, Galena required all sales representatives to nominate a physician for a speaker position. Sales representatives would nominate physicians by sending an email to Lento and MacKenzie explaining why their candidate should be awarded the position. For example, CW1 nominated Dr. Spagnoletti (referenced above) for a speaker position. In an email explaining his rational for the nomination, CW1 stated that, based on the "top prescriber" numbers MacKenzie provided on a weekly basis, Dr. Spagnoletti was a high prescriber of ROOs

and was therefore knowledgeable about that area, and, in addition, he was a good target for conversion from Subsys to Galena/Abstral. MacKenzie replied sternly and instructed CW1 not to put such things in writing. CW1 then called Lento and complained about the reply, which he thought was uncalled for, particularly because he was simply doing what he had been asked and cited to data the company provided. Lento, however, was unmoved, and refused to rescind MacKenzie's admonition. Ultimately, Dr. Spagnoletti was awarded a speaker position, which entailed a two night stay at the Ritz Carton in Atlanta, and $5,000 in "honoraria" for his attendance. According to CW1, Dr. Spagnoletti was not awarded a speaker position due to any expertise or qualification. Rather, he was awarded the position because he was a high prescriber of ROOs, and Galena hoped to induce him to prescribe Abstral, preferentially, to his patients. Ultimately, and much to the irritation of Lento and MacKenzie, their efforts were unsuccessful.

99.     According to CW2, Galena's improper use of speaker inducements and remuneration were not limited to Dr. Spagnoletti. Rather, Galena widely and repeatedly plied such inducements with any physician it believed was likely to write large numbers of prescriptions for Abstral based on their status as high writers of ROOs, generally.

### ii.     Galena's Abstral Relief Registry

100.    Galena also provided illegal kickbacks to physicians prescribing Abstral through its "Abstral Relief Registry" ("Relief Registry"). The Relief Registry ostensibly exists as part of a study to evaluate patient experiences with Abstral for breakthrough cancer pain through assessing patient-reported data using quality-of-life and pain measurement tools. In reality, however, Galena utilized the Relief Registry to provide physicians with kickbacks for prescribing Abstral to their patients.

101.    By way of background, compensating physicians for their participation in a registry program is a strong indicator of an AKS violation. In June 2014, the Office of Inspector

General ("OIG") released a Special Fraud Alert entitled "Laboratory Payments to Referring Physicians." Although in the context of laboratories compensating physicians for registry participation, OIG's analysis is equally applicable to pharmaceutical manufacturers compensating physicians for participating in registry programs.

102.   The OIG Special Fraud Alert provides, in part, the following:

[W]e have repeatedly emphasized that providing free or below-market goods or services to a physician *who is a source of referrals*, or paying such a physician more than fair market value for his or her services, could constitute illegal remuneration under the anti-kickback statute. This Special Fraud Alert supplements these prior guidance documents and advisory opinions and describes two specific trends OIG has identified involving transfers of value from laboratories to physicians that we believe present a substantial risk of fraud and abuse under the anti-kickback statute.

Likewise, when a laboratory pays a physician more than fair market value for the physician's services or for services the laboratory does not actually need or for which the physician is otherwise compensated, the anti-kickback statute is implicated. Such payments are suspect under the anti-kickback statute because of the implication that one purpose of the payments is to induce the physician's Federal health care program referrals. OIG also historically has been concerned with arrangements in which the *amounts paid to a referral source take into account the volume or value of business generated by the referral source*. We are particularly concerned about these types of arrangements because the choice of laboratory, as well as the decision to order laboratory tests, *typically is made or strongly influenced by the physician*, with little or no input from patients.

Moreover, claims that include items or services resulting from a violation of the anti-kickback statute are not payable by Medicare and may constitute false claims under the False Claims Act, even if the items or services are medically necessary. OIG recognizes that the lawfulness of any particular arrangement under the anti-kickback statute *depends on the intent of the parties*. Such intent may be evidenced by the arrangement's characteristics, including its legal structure, its operational safeguards, and the actual conduct of the parties to the arrangement.

OIG has become aware of arrangements under which clinical laboratories are establishing, coordinating, or maintaining databases, either directly or through an agent, purportedly to collect data on the demographics, presentation, diagnosis, treatment, outcomes, or other attributes of patients who have undergone, or who may undergo, certain tests performed by the offering laboratories.

Laboratories that participate in Registry Arrangements often assert that they are intended to advance clinical research to promote treatment, to provide physicians with valuable clinical knowledge for patients with similar disease profiles, and to provide other benefits to physicians or the health care industry generally. Registry Arrangements may take various forms; however, they typically involve payments from laboratories to physicians for certain specified duties, including, by way of example only, submitting patient data to be incorporated into the Registry, answering patient questions about the Registry, and reviewing Registry reports.

Registry Arrangements may induce physicians to order medically unnecessary or duplicative tests, including duplicative tests performed for the purpose of obtaining comparative data, *and to order those tests from laboratories that offer Registry Arrangements in lieu of other, potentially clinically superior, laboratories.* OIG recognizes that whether any particular Registry Arrangement violates the anti-kickback statute depends on the intent of the parties to the arrangement. Payments from a laboratory to a physician to compensate the physician for services related to data collection and reporting may be reasonable *in certain limited circumstances.* However, the anti-kickback statute prohibits the knowing and willful payment of such compensation if *even one purpose* of the payments is to induce or reward referrals of Federal health care program business.

Characteristics of a Registry Arrangement that may be evidence of such unlawful purpose include, but are not limited to, the following:

- Compensation paid to physicians pursuant to Registry Arrangements is on a *per-patient* or other basis *that takes into account the value or volume of referrals.*

- Compensation paid to physicians pursuant to Registry Arrangements is not fair market value for the physicians' efforts in collecting and reporting patient data.

- The laboratory offers Registry Arrangements only for tests (or disease states associated with tests) for which it has obtained patents or that it exclusively performs.

- When a test is performed by multiple laboratories, the laboratory collects data only from the tests it performs.

However, claims that Registries are intended to promote and support clinical research and treatment *are not sufficient to disprove unlawful intent.* Even legitimate actions taken to substantiate such claims, including, for example, retaining an independent Institutional Review Board to develop study protocols and participation guidelines, will not protect a Registry Arrangement if *one purpose* of the arrangement is to induce or reward referrals.

This Special Fraud Alert reiterates our longstanding concerns about payments from laboratories to physicians in excess of the fair market value of the

37

physicians' services and payments that reflect the *volume or value of referrals* of Federal health care program business.

OIG, Special Fraud Alert: Laboratory Payments to Referring Physicians (June 25, 2014) (emphasis added).

103.    According to CW2, the Relief Registry was marketed by Galena sales representatives as a "clinical trial" in which physicians could be paid for their participation. During the pre-launch meeting (referenced above), sales representatives were trained to encourage physicians to sign up for the program.  Once a physician (or nurse) enrolled in the Relief Registry, he or she was compensated for each patient they "registered" for the program. Galena management made clear to its sales representatives during this meeting that, through the Relief Registry, enrolled physicians would be compensated for each patient they put on Abstral. Upon CW2's information and belief, Galena used the Relief Registry as a mechanism to directly compensate physicians for every Abstral prescription they wrote.

104.    Galena's Relief Registry violates the AKS.  Through its relief registry, Galena directly compensates physicians who are a source of referrals, or prescriptions, for Abstral.  The primary purpose of the Relief Registry is to provide Galena with a mechanism to directly compensate physicians for prescribing Abstral.  Galena's intent is demonstrated both by the information provided by CW2 and the structure of the Relief Registry.  As Galena is directly compensating referring physicians, it follows by implication that "one purpose of the payments is to induce the physician's federal health care program referrals." *See id.*  Moreover, the Relief Registry compensates physicians in a way that "take[s] into account the volume or value of business generated by the referral source." *See id.*  This is so because Galena compensates physicians for each patient to whom it writes Abstral. This arrangement is particularly susceptible to fraud because the decision to prescribe a patient to Abstral "typically is made or

strongly influenced by the physician, with little or no input from patients." *See id.*

105.    Galena's Relief Registry has other characteristics which OIG states indicate fraud. First, Galena compensates physicians through its Relief Registry on a per-patient basis.  This clearly "takes into account the value of volume of referrals" in compensating physicians, a red flag for an AKS violation, according to OIG. *See id.*  Second, the Relief Registry only records clinical information regarding Abstral and is available only to physicians prescribing the drug. Lastly, the Relief Registry only collects data from patients prescribed to Abstral, and not from patients prescribed to other drugs in the same class.

106.    Similar to the arrangements described by OIG in its Special Fraud Alert, Galena has characterized the Relief Registry as a "clinical study." *See id.*  Such a description, as noted by OIG, is typical when trying to compensate referral sources through a registry program. *See id.* When viewed in its entirety, it is clear that the Relief Registry is intended to, and did in fact induce physicians to prescribe Abstral "in lieu of other, potentially clinically superior," medications. *See id.*  In addition, Galena's claim that its Relief Registry is intended to "promote and support clinical research and treatment" is "not sufficient to disprove unlawful intent." *See id.*  Therefore, the Relief Registry does not fall into one of the "certain limited circumstances" in which payments to physicians for participation in a registry does not violate the AKS. *See id.* As a result of its violation of the AKS in connection with Abstral prescriptions reimbursed through federal health care programs, Galena has also violation the False Claims Act. *See* 42 U.S.C. § 1320a-7b(g) (2010) (stating, in part, that a "claim that includes items or services resulting from a violation of . . . [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]. . . .").

**5.    As a Result of the Foregoing, the Claims Submitted to Government Health Care Programs for Off-Label Uses Were Not Covered**

107.    The claims submitted to government health care programs for off-label Sancuso and Abstral prescriptions were false because the prescriptions were not properly covered.  As a precondition to payment, healthcare providers are required to verify on Form HCFA-1500 that the prescriptions and services they provide are "medically indicated and necessary for the health of the patient."  As shown, above, the prescriptions that Defendants were inducing physicians to write were neither medically indicated nor necessary.  Rather, and as set forth in detail above, they were expressly for off-label and improper uses, and violated the FCA.

108.    In the Medicaid Program, States will not receive FFP if a drug, as prescribed, is not for a medically acceptable use. FFP is available to States only for "covered outpatient drugs." 42 U.S.C. § 1396b(i)(10). As a result, States' own laws and pharmacy regulations require the drugs to be used for a medically accepted use, and therefore fit the definition of a covered outpatient drug.

109.    "Covered outpatient drugs" do not include drugs that are "used for a medical indication which is not a medically accepted indication." 42 U.S.C. § 1396r-8(k)(3). A medically accepted indication is defined as a use "which is approved under the [FDCA]" or which is "supported by one or more citations included or approved for inclusion" in specified drug compendia. 42 U.S.C. § 1396r-8(k)(6). 42 U.S.C. § 1396r-8(g)(1)(B)(I) identifies the compendia to be consulted: American Hospital Formulary Service Drug Information; United States Pharmaeopeia-Drug Information; and the DRUGDEX information System (collectively, the "Drug Compendia").

110.    Medicare Part A generally pays the inpatient services for eligible beneficiaries in hospital, hospice and skilled nursing facilities, as well as some home healthcare services. 42

U.S.C. §§ 1395e-1395i-5. Prescription drugs are covered under Medicare Part A only if they are administered on an inpatient basis in a hospital or similar setting, and are "reasonable and necessary."

111.    Medicare Part B pays for some types of prescription drugs that are not administered in a hospital setting, and that are "reasonable and necessary." 42 U.S.C. §§ 1395k(a), 1395x(s)(2); 42 C.F.R. § 405.517. These typically include drugs administered by a physician or other provider in an outpatient setting, some orally administered anticancer drugs and antiemetics (drugs which control the side effects caused by chemotherapy), and drugs administered through durable medical equipment such as a nebulizer. 42 U.S.C. §§ 1395k(a), 1395x(s)(2); 42 C.F.R. § 405.517.

112.    The Medicare program Part D drug benefit covers all drugs that are considered "covered outpatient drugs" under 42 U.S.C. § 1396r-8(k).

113.    The off-label uses alleged herein are not supported by "clinical research that appears in peer-reviewed medical literature," and could not, under any circumstances, be determined to be "medically accepted as safe and effective" or "reasonable and necessary" for such uses. Claims for such off-label uses were therefore not covered by Medicare either.

114.    Defendants were aware that the natural and probable consequence of its promotion of off-label uses of Sancuso and Abstral was that health care providers would submit claims for payment to Government Healthcare Programs for the off-label use. Notwithstanding this knowledge, Defendants vigorously promoted these off-label uses. Defendants were also aware that its illegal promotion did in fact result in false claims to these and other government payors for the off-label uses. Moreover, Defendants were aware that their promotional activity was a substantial factor in producing the claims.

41

115.    When pharmacies, physicians and other healthcare providers submitted claims based upon a physician's prescription for Sancuso and Abstral for off-label uses, the claims they submitted were false because such off-label uses were not supported by a citation in one of the Drug Compendia specified by 42 U.S.C. § 1396r-8(g)(1)(B)(1) (Medicaid), not supported by "clinical research that appears in peer-reviewed medical literature," and could not, under any circumstances, be determined to be "medically accepted generally as safe and effective" or "reasonable and necessary" (Medicare).

116.    False claims to these government health care programs for off-label prescribing was the direct and proximate result of unlawful off-label marketing efforts by Defendants. Therefore, Defendants caused the submission of these claims. Defendants caused the submission of false claims, since healthcare providers submitted Pharmacy Claim Forms and CMS 1500 Form to Government Healthcare Programs, and the States submitted Form CMS-64 to the Federal Government, all claiming reimbursement for Sancuso and Abstral for such off-label uses.

### COUNT I
### (False Claims Act 31 U.S.C. § 3729(a))

117.    Relator repeats each allegation in each of the proceeding paragraphs of this Complaint with the same force and effect as if set forth herein.

118.    As described above, Defendants have submitted and/or caused to be submitted false or fraudulent claims to Medicare by engaging in off-label marketing and providing kickbacks to referring physicians.

119.    By virtue of the acts described above, Defendants have violated:

(1)    31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval; and/or

(2)     31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim; and/or

(3)     31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government.

120.    To the extent any of the conduct alleged herein occurred on or before May 20, 2009, Relator realleges that Defendants knowingly violated 31 U.S.C. § 3729(a)(1); 31 U.S.C. § 3729(a)(2); and 31 U.S.C. § 3729(a)(7) prior to amendment, by engaging in the above-described conduct.

121.    By reason of the foregoing, the United States has suffered actual damages and is entitle to recover treble damages plus a civil monetary penalty for each false claim.

## JURY TRIAL DEMANDED

122.    Relator demands a jury trial.

## PRAYER FOR RELIEF

WHEREFORE, Relator prays that the Court enter judgment against Defendants as follows:

(a)     that the Government be awarded damages in the amount of three times the damages sustained by the Government because of the false claims alleged within this Complaint, as the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, provides;

(b)     that civil penalties of $11,000 be imposed for each and every false claim that Defendants caused to be presented to the United States and/or its grantees, and for each false record or statement that Defendants made, used, or caused to be made or used that was material to a false or fraudulent claim;

43

(c)     that attorneys' fees, costs, and expenses that Relator necessarily incurred in bringing and pressing this case be awarded;

(d)     that Relator be awarded the maximum amount allowed to them pursuant to the False Claims Act; and

(e)     that this Court order such other and further relief as it deems proper.

Dated:  September 19, 2014                    **THE WEISER LAW FIRM, P.C.**

James M. Ficaro
Christopher L. Nelson
22 Cassatt Avenue, First Floor
Berwyn, PA 19312
Telephone: (610) 225-2677
Facsimile: (610) 225-2678

*Attorneys for Relator*